C. B. PORTERFIELD and Morris Margulis, Intervenors, Appellants,

v.

L. M. GERSTEL, Receiver of Metal Extrusions, Inc., Bankrupt, Appellee.

No. 14913.

United States Court of Appeals,
Fifth Circuit.

March 30, 1955.

Rehearing Denied May 10, 1955.

Thomas H. Anderson, Miami, Fla., Marion E. Sibley, Miami Beach, Fla., Joseph Gassen, Sibley & Davis, Miami Beach, Fla., Anderson & Nadeau, Miami, Fla., for appellants.

Marx Faber, Herbert U. Feibelman, Harold Friedman, Miami, Fla., Feibelman & Friedman, Miami, Fla., for appellee.

Before HUTCHESON, Chief Judge, and RIVES and TUTTLE, Circuit Judges.

TUTTLE, Circuit Judge.

This appeal presents the question as to whether the District Court erred in ratifying and confirming an order of the Referee in Bankruptcy for the Miami Division of the Southern District of Florida dismissing a petition on behalf of owners of 50% of the common stock of a corporate voluntary petitioner in bankruptcy, who were also two of five directors of the corporation, protesting the adjudication and seeking to have it set aside on the ground that the Bankruptcy Court was being improperly and fraudulently used to assist the other 50% stock interest and three directors to "freeze out" intervenors, and that no bona fide corporate purpose or action existed to authorize the filing of the voluntary petition.

On August 26, 1953, the secretary and treasurer of Metal Extrusions, Inc. signed and caused to be filed in the District Court, as a Court of Bankruptcy, a petition purporting to be a voluntary pe-

tition in bankruptcy of Metal Extrusions, Inc.

The attached schedule showed that the company had an excess of assets over liabilities of approximately $80,000.

The District Court entered adjudication of bankruptcy on the same day and referred the matter to the Referee.

On September 4th, approximately 10 days later, appellants here, C. B. Porterfield and Morris Margulis, filed an intervention alleging that they were owners of 50% of the stock of the bankrupt for which they had paid $50,000 and that Porterfield was also the owner of $29,-500 of the corporation's debentures or other obligations and that they were two of the five directors of the company. In effect they then charged substantially as follows:

That the corporation was not insolvent; that its affairs were in good shape; it was doing a flourishing business and had made a profit every month of its short operation; that on August 1st, less than a month before the date they acted to put the company into bankruptcy, the majority of the directors, Ben Marden, Sonny Marden and J. J. Pass, had bought the remaining 50% of the stock of the company from its original owners and had also bought from them debentures of the corporation and other loans owed by the company so that either they themselves or their controlled corporation, National Steel & Copper Plate Company, invested in the bankrupt some $148,000; that following acquisition of the stock Sonny Marden and Pass were elected to the Board of Directors, which thereafter consisted of Porterfield, President, Margulis, Vice-President, Marden, Secretary, and Pass, Treasurer. Thereupon Ben Marden, a brother of Sonny, advanced $30,000 to the Company on a 90-day note, and it was alleged that he represented to the intervenors that he would advance such other funds as the company needed and secure a line of credit of $100,000 at 4½% interest at a bank if the stockholders would elect him a director and chairman of the board;

that they did so, relying upon his statement, thus giving the new stockholders a majority of the board; that, contrary to this promise, there was no intent to carry it out, but, it was alleged, a conspiracy had been made by the Mardens and Pass to get control of the corporation in this manner and put it into bankruptcy for the sole purpose of wiping out the interests of Porterfield and Margulis and owning the corporation's business and assets for themselves; that immediately after acquiring a majority position on the board of directors, the newcomers took physical charge of the business to the exclusion of intervenors, deliberately diverted funds of the corporation, deliberately and wilfully injured the company's credit, and took other improper steps to lend color to the filing of a contemplated petition in bankruptcy; that on August 24th, a special meeting of the directors was called, at which, without any discussion being permitted, the directors, by the vote of the Mardens and Pass against the vote of the two intervenors, voted to place the company in voluntary bankruptcy in accordance with their prearranged plan. The filing of the petition in bankruptcy followed.

The bankrupt, in its answer, admitted the facts as to the acquisition of the stock and election of directors, but denied that control was acquired for any ulterior or improper purpose; alleged that there was dissension between intervenors themselves which caused improper operation of the plant, which was therefore closed; that the company was not able to pay its debts as they matured and that their action in filing the petition in bankruptcy was for the protection of the creditors of the corporation.

The Referee conducted a hearing on the issues joined by the intervention and answer. After hearing intervenors' testimony he dismissed the intervention without making any findings of fact or conclusions of law. He is not required to make any such findings or conclusions. On the filing of a petition to the District Court for review of the Referee's order,

the Referee filed his certificate of review,[1] containing his findings and conclusions.

The law permits any ordinary business corporation to file a petition in bankruptcy to avail itself of the benefits of the bankruptcy statute.[2] Ordinarily it is unimportant what may be the purpose or motive of the corporation,[3] if in truth and in fact it is the act of the corporation and not of officers or directors acting for their own benefit as distinguished from that of the corporation to which they have a fiduciary responsibility. It is equally clear, we think, that even a voluntary petition may not be filed to perpetrate a fraud.[4] This principle has been recognized by this court in Shearin v. Cortez Oil Co., 5 Cir., 92 F.2d 855, although in that case we sustained the district court in holding that no sufficient showing of the facts alleged had been made.

This, then, brings us to the question as to whether the intervention alleges facts, which, if proved, would authorize a holding by the Referee that the adjudication should be vacated and, if so, whether we think the proof introduced on behalf of the intervenors, unless controverted by the bankrupt, required that the adjudication be set aside.

We think it quite clear that, if the allegations of the intervention were true, then the Referee should have vacated the order of adjudication and dismissed the voluntary petition. If these allegations were true, the vote of the majority of the directors at the meeting on August 24th, was not truly the act of the corporation, but it was an act of the new directors taken for their own benefit and to the detriment of their corporation. Under such circumstances the filing of a voluntary petition in the name of the corporation would be a fraud on the court as well as a fraud on the corporation and its other stockholders.

In view of the fact that the Bankruptcy Court is made available for the prompt relief of all interested persons,

---

1. "Opinion of the Court (Certificate of Referee)

"The testimony in this cause shows that the bankrupt corporation is composed of a 50–50 ownership. The petitioners own 50% of the stock, and the stockholders who filed the voluntary Petition own the other 50%.

"It was contended by the petitioners that the other stockholders in perpetration of a fraudulent scheme, caused the bankruptcy petition to be filed as a means of procuring a sale of the assets, which they would purchase and thereby wipe out the interests of the petitioner; that the corporation was solvent and was doing a flourishing business.

"I do not think the testimony introduced bears out the contention of the petitioners. The testimony introduced shows that there were five directors regularly elected; that these directors by a majority vote, voted to file the petition in bankruptcy. The testimony of the petitioners show that the company was under-capitalized; that it was insolvent in the equity sense in that it could not pay its bills as they matured; and that the directors were justified in seeking relief from the Courts.

"And it is entirely probable that if they had not that creditors would have. Of course, it is true that the business is not insolvent in the bankruptcy sense. It does have more assets than it has liabilities, but it is one of those unfortunate situations in which 50% of the company wants to go one way, and 50% the other. I know of no method whereby such equally antagonistic parties can be forced to become friendly for their own good. Therefore, frequently the Courts are resorted to sell property which is jointly owned by such parties. It is not to be presumed however that either party will be given an advantage for sales in this Court, and indeed this one is to be a public sale to the highest and best bidder for cash at public outcry set for October 16, 1953, at 2:00 P. M., at which the highest bidder, which can be either side of the controversy, or any outside persons that they may interest, may purchase."

2. Title 11, U.S.C.A. § 95, sub. a.
"§ 95. Who may file and dismiss petitions
"(a) Any qualified person may file a petition to be adjudged a voluntary bankrupt."

3. 1 Collier Bankruptcy (14th Ed.) 578.

4. Zeitinger v. Hargardine-McKittrick Dry Goods Co., 8 Cir., 244 F. 719. Also see cases cited in 1 Collier Bankruptcy (14th Ed.) 579.

the bankrupt, the creditors, and the individual stockholders of the bankrupt, we recognize that an appellate court should be slow to upset action taken in such a proceeding. On the other hand, the very summary nature of the proceedings in the Bankruptcy Court, which in this case permitted the Mardens and Pass to buy into a successfully operating corporation, put it into bankruptcy within four weeks and to obtain an order for the sale of its assets two weeks later, such sale being delayed only because of the filing of this intervention, and actually followed by a sale in less than two months from the filing of the petition, makes it necessary for the courts to prevent, so far as possible, any abuse of this procedure. The beneficent purpose of the bankruptcy laws, with their emphasis on summary action and easy transition of property from the hands of a debtor into the hands of creditors, will be largely frustrated if these summary procedures are permitted to be used for purposes entirely foreign to the desirable objectives of these laws.

We, of course, do not imply that the facts alleged in the intervention are true. The alleged bankrupt has not put in its proof in reply, but we do hold that the intervenors made out a prima facie case, and unless the proof already adduced is met by countervailing evidence, the intervention must be sustained and the adjudication set aside. Without attempting to set out all the evidence, it is sufficient we think to point to the testimony of the disinterested witness, Faden, who testified, among other things, that the Mardens said this was not going to be a bankruptcy due to finances, it was just sort of a family argument, a civil war; that the Mardens were going to own the company and that Porterfield and Margulis were going to be washed out; he also testified that Sonny Marden said Porterfield and Margulis tried to hold him up on selling him their stock and he was going to wipe them out—they wouldn't have a penny coming to them as far as common stock was concerned [5]

**5.** The following testimony was given by Faden:

"Q. Did you have any conversation with him about the matter of the company's continuing to do business and what they were going to do with the business? When I say 'they' I mean the Mardens. A. Yes, sir.

"Q. What were your conversations? A. The conversations were, that after Mr. Margulis and Mr. Porterfield were out they would be running the company and it was going to be run on a larger scale, new presses, and that sort of thing.

"Q. Did they give you any instructions as to what, if anything, to say to customers of the business, about its future? A. You mean, while we were shut down?

"Q. Yes. A. Yes, they told me to tell the customers that this was not going to be a bankruptcy due to finances, it was just a sort of family argument or civil war.

"Q. Did they say anything about whether they were going to own the company afterwards or not? A. Yes.

"Q. What did they say about that? A. They said they were going to own the company, that the other two were washed out.

"Q. What, if anything, was told to you by the Mardens as to what would happen to the stock interest of Mr. Porterfield and Mr. Margulis? A. Mr. Marden said it would be washed out, it wouldn't be of any value to the common stock after the creditors were taken care of.

\* \* \* \* \*

"Q. Go ahead and tell what Mr. Sonny Marden told Wall on the telephone in your presence.

\* \* \* \* \*

"A. He told Mr. Wall we were going to be operating, that Metal Extrusions were not in financial difficulties, it was just a sort of argument between the owners and it would be resold very shortly and we would be back in business.

"Q. Did you hear the conversation between Ben Marden and Al Brenner that took place during this period of time? A. Yes, sir.

"Q. Who is Al Brenner? A. Owner or president, I don't know which, of Superior Window & Jalousie Corporation.

"Q. Are they a customer of Metal Extrusions? A. Yes, sir.

"Q. Tell the Court what the conversation was between Mr. Ben Marden and Mr. Al Brenner that took place in your presence. A. The conversation was that Mr. Brenner wanted our plant to be open because he needed metal very badly, and he was trying to talk Mr. Marden in-

It is, of course, not necessary, in order for a person or corporation to file a voluntary petition in bankruptcy, that it, in fact, be insolvent. The question of solvency is, however, extremely important in ascertaining whether the benefits of the Bankruptcy Act are being used in bad faith or fraudulently if there is any substantial evidence to that effect, since no one would contend that the bankruptcy court exists for any purpose other than to aid financially embarrassed debtors in adjusting their affairs with their creditors. Here there is no evidence that a single creditor was concerned about his bills; there is evidence, to the contrary, that the new management of the business caused bills to be paid that were not yet due, thus dissipating the funds; there is evidence that they told one of the intervenors not to bother trying to make collections when he offered to do so; there is affirmative evidence by the company's principal banker that the bank's loan was satisfactory. In short, it is plain from the testimony, as it stood at the end of the hearing, that the company's financial problems really had nothing whatever to do with the filing of the voluntary bankruptcy petition. In this state of affairs, in the light of the evidence of improper motive, there was a burden on the company to refute the contentions and proof of the intervenors. The Referee erred in dismissing the intervention. The District Court likewise erred in its order ratifying and confirming the order of the Referee.

■■■■ This leaves the question as to whether the failure of the intervenors to make a supersedeas bond, followed by what appears on the record to be a full and final administration of the alleged bankrupt's estate, causes the matter to become moot, thus effectively denying to intervenors any right of appeal from the erroneous ruling of the court below. The failure to obtain an order of supersedeas does not ordinarily affect the right of appeal. 4 C.J.S., Appeal and Error, § 678. Under the facts of this case as alleged, and as the proof now stands, we can not say that the bankruptcy court is without the power to correct the wrong that resulted if, on a full hearing, it determines that the intervenors have made out a case of fraud. Part of the conspiracy alleged was that the majority directors would acquire the business through the process of bankruptcy. The testimony is to the effect that they repeatedly said they would own the business after the proceedings were concluded. They clearly placed themselves in the position of dominating creditors. The record is silent as to the actual sale and as to any identity of interest between the Mardens and the purchaser. However, since the appeal to this court was filed before the sale was consummated, all parties took notice of the pendency of this appeal. If the Referee finds upon remand of this case that the facts show that the adjudication of bankruptcy should be set aside under the legal principles herein stated, then whatever actions followed the entry of his order dismissing the intervention must be set aside unless legal rights of strangers to the proceedings have intervened. It is to be noted that there were at all times sufficient assets in the company to pay all creditors, and there is no indication that they would in any way be prejudiced by an order setting aside the sale and placing title to all of the assets back in the hands of the alleged bankrupt. All orders allowing fees and commissions would, under such a holding of the Referee, be void, and such payments would be subject to being repaid to the alleged bankrupt's estate. It would be the duty of the bankruptcy court to recover for

---

to making some sort of amicable out-of-Court settlement between Mr. Porterfield and Morris, and the conversation came to no avail—we went on into bankruptcy.

"Q. Didn't Mr. Marden make any statements in your presence during that conversation about what was going to happen with Mr. Porterfield and Mr. Margulis? A. Yes, he said they tried to hold him up on selling their part of the stock and, therefore, he was going to wipe them out, they wouldn't have a penny coming to them as far as common stock was concerned."

the alleged corporate petitioner all of the assets of which it was possessed on the day of the filing of the petition, except insofar as such recovery is prevented by intervening legal rights.

This court does not have sufficient factual basis to give specific direction to the trial court and it should not do so until that court concludes its hearing on the facts and makes its determination on the issue raised by the intervention. For us to act otherwise would amount to our deciding legal issues on hypothetical questions.

However, it is appropriate to point out for the guidance of the trial court that the measure of relief that can be granted by it to the corporation whose adjudication as a bankrupt is here attacked must be largely measured by the facts as to participation of the parties in the acts complained of, privity of interest with such parties, actual knowledge of the existence of the controversy and this appeal, as well as the good faith of the parties who now claim any benefit from the administration of the estate.[6]

The order of the District Court is reversed and the case is remanded with directions that the bankruptcy court conduct a further hearing to afford the trustee an opportunity to meet the prima facie case already made by the intervenors or in default of this to sustain the petition of intervenors to set aside the adjudication of voluntary bankruptcy and to take such further proceedings as may be consistent with this opinion.

On Petition for Rehearing.

PER CURIAM.

By his motion for rehearing, appellee contends that we erred in the last paragraph of our opinion in that we directed that the bankruptcy court give the trustee an opportunity to meet the prima facie case made by appellants, whereas, appellee says the burden should be on the alleged bankrupt to meet this case. The alleged bankrupt is before this court only in the person of the trustee in bankruptcy. However, it is quite appropriate to provide that on further hearing either the trustee or alleged bankrupt shall be afforded an opportunity to meet the case made out by the intervenors. The opinion is modified accordingly.

Appellee also contends that the part of our opinion that stated "All orders allowing fees and commissions would, under such a holding of the Referee (i e., a holding that the adjudication of bankruptcy should be set aside), be void, and such payments would be subject to being repaid to the alleged bankrupt's estate" is erroneous and should be modified. In support of this contention appellee asserts that the receiver and trustee were passive and neutral in the controversy. This overlooks the basic proposition that an appeal had been taken to this court before the sale was confirmed *upon the report of the trustee.* All parties who had notice of this fact, (and such notice was actually served on the trustee) acted thereafter at their own risk.

A motion for rehearing by Metal Extrusions, Inc., the alleged bankrupt, has also been filed in this case. Although this motion was filed out of time, more than 21 days having elapsed after the decision of this court, and although the alleged bankrupt does not appear to be a party to this appeal except as represented by the receiver, the motion has

---

**6.** Much guidance as to the legal principles to be applied in determining the respective rights of the parties concerned can be found in the numerous cases collected in the annotations in 29 A.L.R. 1071, and 142 A.L.R. 310; and in Davis v. Gaines, 104 U.S. 386, 26 L.Ed. 757; Hays v. Sound Timber Co., 9 Cir., 261 F. 571, 29 A.L.R. 1067; Wilkin v. Shell Oil Co.,

10 Cir., 197 F.2d 42, 48–49; and Johnson v. McKinnon, 54 Fla. 221, 45 So. 23, 13 L.R.A.,N.S., 874, 127 Am.St.Rep. 135, 14 Ann.Cas. 180.

See further Tucker v. Baker, 5 Cir., 214 F.2d 627; W. F. Potts Son & Co. v. Cochrane, 5 Cir., 59 F.2d 375; Cochrane v. W. F. Potts Son & Co., 5 Cir., 47 F.2d 1026.

been considered. The motion is without merit and it is overruled.

Except as modified above, the opinion is reaffirmed as written and both motions for rehearing are

Denied.