**In re COASTAL CABLE T.V., INC., Debtor.**

**Gerald CONNELL, et al., Appellants,**

v.

**COASTAL CABLE T.V., INC., et al., Appellees.**

No. 82–1923.

United States Court of Appeals, First Circuit.

Argued April 7, 1983.

Decided June 21, 1983.

Robert C. Corrente, with whom Michael P. DeFanti, and Hinckley & Allen, Providence, R.I., were on brief, for Gerald Connell, et al.

Peter G. Berman, with whom Richard S. Mittleman, and Zietz, Mittleman & Webster, Providence, R.I., were on brief, for Coastal Cable T.V., Inc.

Before CAMPBELL, Chief Judge, BREYER, Circuit Judge, and TAURO,* District Judge.

BREYER, Circuit Judge.

This is an appeal from a decision of the bankruptcy appellate panel, 24 B.R. 609 (Bkrtcy.1982), affirming an order of the bankruptcy court that authorizes Coastal Cable T.V., Inc. to sell for about $3 million its major asset, a cable television license. The bankruptcy court made no findings of fact and, apparently, did not conduct a full hearing before issuing its order. As the facts are strongly contested, we shall set forth the versions of both the appellants and the appellees.

Appellants tell the following story: With a few exceptions, they are local business and professional people who helped found Coastal in 1972. They pledged funds, some contributed services, and they agreed to serve as its officers and directors. They believed that they were its shareholders as well. Coastal applied for, and won, a cable T.V. license for Newport, Rhode Island, and the surrounding area, in part because the state public utilities commission was impressed by Coastal's "broad local actual ownership." Once the award became final, Coastal's value skyrocketed. But, at that point, the attorney that the appellants had retained to file the requisite papers, Paul Burke (an appellee here), unlawfully refused to give them their share certificates and instead issued all the shares to himself. Burke, as sole shareholder, then fired appellants as officers and directors of Coastal. While this was going on, he negotiated the sale of Coastal's shares, and eventually transferred those shares to George Sisson who, in turn, resold them to Berkshire Cable Television Co. Appellants tried to stop these moves through a state court suit, which apparently remains unresolved. In the meantime, the state public utilities commission, discovering that appellants might no longer be the shareholders and directors of Coastal, began proceedings to issue a new license to someone else. The commission's action did not destroy Coastal's value, however, for the muddy legal situation meant that some of the new applicants for the license were willing to pay a high price for Coastal's old rights—whatever they might be.

The case arrived in bankruptcy court because Sisson, when he sold his interest to Berkshire, agreed with Berkshire that Coastal would assume some of Sisson's debts. Berkshire loaned Coastal about $65,000 for it to use to repay these debts. That arguably made Berkshire a creditor of Coastal, and Berkshire then petitioned the company that (it claimed) it owned into bankruptcy under chapter 11. Berkshire said that Coastal owed various creditors about $110,000 and owned a license worth $3 million; and, Berkshire asked the bankruptcy court to authorize the sale of the license to generate cash to pay the debt.

Appellants oppose the sale of the license. They believe that with Coastal back in their hands the public utilities commission would allow them to provide service; and, under those circumstances, they presumably feel the license would be worth considerably more than $3 million. They asked the bankruptcy judge to decide whether to authorize the sale only after he had adjudicated the share ownership question—a matter of state law. The judge began to do so; the parties decided to settle instead; the settlement apparently fell apart; and the

* Of the District of Massachusetts, sitting by designation.

bankruptcy judge then authorized the sale of the license without deciding the share ownership question.

The version of the appellees (Coastal, Burke and related parties) can be stated more briefly. Obviously, they do not agree that Burke cheated the appellants. They contend that the sales described were all legitimate, and they see this case as a simple effort by a creditor to force its debtor to sell its valuable asset and pay its debts before the asset's value falls.

The bankruptcy appellate panel agreed with the appellees. It made a few general statements to the effect that a bankruptcy court could consider what is best for the debtor (Coastal) or the creditors (Berkshire) without *necessarily* considering what is best for the shareholders or who the shareholders are. *See, e.g., In re Equity Funding Corp. of America,* 492 F.2d 793, 794 (9th Cir.), *cert. denied sub nom. Herman Investment Co. v. Loeffler,* 419 U.S. 964, 95 S.Ct. 224, 42 L.Ed.2d 178 (1974). And, it found no abuse of discretion here.

■ We find the bankruptcy appellate panel in error as to abuse of discretion. Although the record is too bare for us to say who is right about the underlying facts (particularly as the bankruptcy judge made no findings), we do not see how the bankruptcy judge could decide whether the T.V. license ought to be sold without first deciding *whom* to believe about the shares. If Berkshire rightfully owns the shares, both Coastal and it are better off if the license is sold. On the other hand, if appellants are correct and they own the shares, neither they nor Coastal (nor for that matter Berkshire) are better off through a sale. Unless one makes various heroic factual assumptions, it is impossible to see how the bankruptcy court could find a sale appropriate without first knowing who owns Coastal.

■ The record before us also raises a question related to the bankruptcy court's jurisdiction—a matter that we raise *sua sponte. Clark v. Paul Gray, Inc.,* 306 U.S. 583, 588, 59 S.Ct. 744, 748, 83 L.Ed. 1001 (1939); *Louisville & Nashville Railroad v.*

*Mottley,* 211 U.S. 149, 152, 29 S.Ct. 42, 43, 53 L.Ed. 126 (1908) (duty of court to see that jurisdiction is not exceeded). The record suggests that (depending upon the facts) this case may run afoul of certain very basic bankruptcy principles. One such principle is that a person in bankruptcy, while not necessarily insolvent, *see* 11 U.S.C. § 109, must at least owe debts (even though the statute is mysteriously silent on the question). *See In re Fox West Coast Theatres,* 25 F.Supp. 250, 259 (S.D.Cal.1936), *aff'd,* 88 F.2d 212 (9th Cir.), *cert. denied sub nom. Talley v. Fox Film Corp.,* 301 U.S. 710, 57 S.Ct. 944, 81 L.Ed. 1363 (1937); *In re Yarbrough,* 18 F.Supp. 359, 360 (M.D.Ga. 1937); *In re People's Warehouse Co.,* 273 F. 611, 613 (S.D.Miss. [1921]); 2 *Collier on Bankruptcy,* ¶ 109.02 (15th ed. 1980). Another such principle prohibits the use of the bankruptcy court, a court of equity, to further a fraudulent purpose. A bankruptcy court,

[i]n the exercise of its equitable jurisdiction ... has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in the administration of the bankrupt estate.

*Pepper v. Litton,* 308 U.S. 295, 304–05, 307–08, 60 S.Ct. 238, 244, 245–46, 84 L.Ed. 281 (1939); *see also Porterfield v. Gerstel,* 222 F.2d 137, 142 (5th Cir.1955); *Zeitinger v. Hargadine-McKittrick Dry Goods Co.,* 244 F. 719 (8th Cir.), *cert. denied,* 245 U.S. 667, 38 S.Ct. 64, 62 L.Ed. 538 (1917); *In re North Broadway Funding Corp.,* 6 B.R. 133, 137 (Bkrtcy.E.D.N.Y.1980); *In re Parr,* 1 B.R. 453, 456 (Bkrtcy.E.D.N.Y.1979). Furthermore, a chapter 11 reorganization plan must be submitted in good faith. 11 U.S.C. § 1129(a)(3); *see* 5 *Collier on Bankruptcy* ¶ 1129.02[3][a] (15th ed. 1981). That is to say, there must be some relation—at least an arguable relation—between the chapter 11 plan and the reorganization-related purposes that the chapter was designed to serve. *See In re Nikron, Inc.,* 27 B.R. 773, 778 (Bkrtcy.E.D.Mich.1983); *In re Nite Lite Inns,* 17 B.R. 367, 370 (Bkrtcy.S.D.Cal.1982); *In re BBT,* 11 B.R. 224, 235 (Bkrtcy.D.Nev. 1981).

We fear that one or more of these basic principles may have been violated for the following reasons: First, it is uncertain whether there is a legitimate debt. The record indicates that Coastal's debts largely consist of the $85,000 it owes to Berkshire. While the record does not reveal the exact nature of that debt, it suggests the debt is connected to Berkshire's purchase from Sisson of Coastal stock. When this court asked Coastal's counsel at oral argument, "What led Coastal to owe Berkshire $85,000?", he replied, "I cannot answer that." This court then asked whether:

> a dispute . . . to sell a $3 million license is being adjudicated by a federal bankruptcy judge, with what appears to be not a full hearing, on the basis of an $85,000 debt that may not exist.

Counsel for Coastal replied, "It is substantially correct." It appears possible that, if appellants own Coastal, Coastal may have no corporate debt at all. If so, whether the bankruptcy court would have jurisdiction to proceed further is doubtful.

Second, there are sufficient allegations of fraud in this case, and they are closely enough related to the relevant debt and in this instance to the court's jurisdiction, to warrant determining the underlying facts and their relation to the question. *Cf. Porterfield v. Gerstel,* 222 F.2d at 140; *Zeitinger v. Hargadine-McKittrick Dry Goods Co., supra;* 2 *Collier on Bankruptcy* ¶ 109.02 (15th ed. 1980).

Third, the need for a bankruptcy proceeding once the state-law ownership question is resolved seems doubtful. If appellants own the shares, there may be no debt and, in any event, they do not request a sale of a license. If appellees own the shares, they can simply sell the license; they do not need a bankruptcy court to do so. To meet the "good faith" requirement of § 1129(a)(3), many courts have held that a reorganization plan must bear some relation to the statutory objective of resuscitating a financially troubled corporation. *See, e.g., In re Nikron, Inc., supra; In re Nite Lite Inns, supra; In re BBT, supra. See generally Fidelity Assurance Association v. Sims,* 318 U.S. 608, 616–18, 63 S.Ct. 807, 811–12, 87 L.Ed. 1032 (1943); *Tennessee Publishing Co. v. American National Bank,* 299 U.S. 18, 22, 57 S.Ct. 85, 87, 81 L.Ed. 13 (1936); *Lemm v. Northern California National Bank,* 93 F.2d 709, 711 (9th Cir.1937). We do not understand the relation between this reorganization plan with its proposed sale and any of the purposes of chapter 11. Even aside from § 1129, can a sole shareholder of a solvent corporation owning valuable assets and owing the sole shareholder a comparatively tiny debt simply ask a court to sell the asset for him? Would there be, in such an instance, a "case or controversy" within the terms of Article III of the Constitution?

■ We shall not resolve these questions now, however, for the record is inadequate and they have not been argued. Moreover, given the importance of state law to this case, we believe that a federal district court, not a bankruptcy court, should pass upon them in the first instance. *See Northern Pipeline Construction Co. v. Marathon Pipeline Co.,* 458 U.S. 50, 83, 102 S.Ct. 2858, 2878, 73 L.Ed.2d 598 (1982); *cf. Temporary Rule of the Circuit Council for the First Circuit,* Dec. 22, 1982. We therefore vacate the judgment of the bankruptcy appellate panel and, pursuant to our supervisory powers, we send this matter to the District Court for the District of Rhode Island with instructions to determine the appropriateness of continued bankruptcy court proceedings. If that court finds bankruptcy court proceedings in order, it may take any further steps needed to determine the share ownership question or such other action as it finds appropriate. It may also consider whether or not it is appropriate to maintain in existence while it considers these matters the "automatic stay" of related state court proceedings. *See* 11 U.S.C. § 362.

*So ordered.*