USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit
 ____________________

No. 98-1081

 BRUCE JEREMIAH, ANDREW JEREMIAH,
 AS GENERAL PARTNERS OF SILVER SPRING CENTER,
 Plaintiffs, Appellants,

 v.

 ANDREW RICHARDSON,
 R.S.S. REALTY TRUST, INC., ETC., ET AL.,
 Defendants, Appellees.

 ____________________

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF RHODE ISLAND

 [Hon. Ronald R. Lagueux, U.S. District Judge]

 ____________________

 Before

 Torruella, Chief Judge,

Rosenn, Senior Circuit Judge,

 and Stahl, Circuit Judge.

 _____________________

 Edward G. Lawson for appellants.
 Andrew S. Richardson, with whom Boyajian, Harrington &
Richardson was on brief, for appellee Trustee, Andrew Richardson.

 ____________________

 July 2, 1998
 ____________________ ROSENN, Circuit Judge. This appeal, arising out of a
unique set of facts, raises an important question pertaining to a
bankruptcy court's discretion in authorizing a trustee in a Chapter
11 reorganization to sell the primary asset of the debtor without
first resolving allegations of fraud committed by the prospective
purchaser and its principals. The fraud is alleged to have been
committed by the purchaser and the debtor's former counsel in the
acquisition of a mortgage against the asset. The debtor's asset
comprised a group of old mill buildings which the debtor leased to
retail, commercial, and light industrial tenants. Because the
principals of the debtor, a partnership that filed the petition for
Chapter 11 reorganization, were in prison, the bankruptcy court
appointed a trustee for the estate.
 The Trustee, who had brought an adversary proceeding with
the approval of the debtor, to set aside the mortgage on the
property acquired by assignment from the original mortgagee
allegedly by prepetition fraud, concluded that it would be in the
best interests of the bankrupt estate to accept an offer to
purchase the property from the mortgagee and settle the adversary
proceeding to set aside the mortgage on it. The bankruptcy court,
over the vigorous objection of the debtor, approved the sale and
settlement. The debtor timely appealed to the district court which
affirmed. The debtor thereupon appealed to this court. We also
affirm. I.
 Bruce and Andrew Jeremiah are the partners of the debtor,
the Silver Spring Center, a Rhode Island general partnership. The
Silver Spring Center (the "Center"), owned a 500,000-square-foot
former textile factory complex consisting of approximately 18
buildings located in Providence, Rhode Island. Its business
essentially was to lease space in this complex to retail,
commercial, and light industrial tenants. The Jeremiahs previously
had been tenants in the Center for 30 years and had owned it for
approximately the past 14 years.
 In 1988, the Jeremiahs engaged attorney Z. Hershel Smith
to represent them in a dispute they were having with the Center's
prior mortgagee, the New Bedford Institution for Savings ("The
Bank"). Upon Smith's recommendation, the Center filed a Chapter 11
bankruptcy petition. While Smith was representing the Center in the
bankruptcy proceedings, it developed that he also was representing
some of its creditors. Due to this conflict of interests, his
mismanagement of the Center's funds, and a request of the then-
Chapter 11 trustee, the Jeremiahs discharged Smith. With the
assistance of new counsel, they negotiated the dismissal of the
reorganization petition in June 1991. Smith has since been
disbarred, convicted of fraud and embezzlement of clients' funds,
and sentenced to 10 years imprisonment.
 In early 1993, the Jeremiahs began to renegotiate the
$2.1 million mortgage on the Center with the mortgagee. At the same
time, Smith, without the consent or knowledge of the Jeremiahs,
allegedly also entered into negotiations with their mortgagee on
behalf of himself and the R.S.S. Realty Trust ("RSS"), a Rhode
Island Corporation, to purchase the mortgage, using confidential
information gained during his three-year prior representation of
the Center. As a result, The Bank ceased negotiations with the
Jeremiahs and instead sold the $2.1 million mortgage to RSS for
$200,000. RSS's principals are William Ricci and the Smith Family
Trust, of which attorney Smith's children are the beneficiaries.
Ricci, like Smith, also is a convicted felon, having been convicted
of various fraud and other charges.
 Shortly thereafter, RSS filed an ex parte petition in a
Rhode Island state court alleging waste on the part of the Center,
seeking to have the Center placed in receivership, and seeking to
foreclose its recently acquired mortgage. Because of RSS's actions,
in December 1994, the Center once again sought Chapter 11
protection in the bankruptcy court. Because the Jeremiahs, at the
time, were in jail for allegedly dealing drugs out of the Center,
the court appointed the appellee, Andrew S. Richardson, Trustee to
operate the Center. 
 The Jeremiahs vehemently contested the validity, extent,
and priority of the mortgage RSS had acquired from the New Bedford
Bank. Therefore, the Trustee commenced an adversary proceeding
against RSS and Smith in the bankruptcy court. Specifically, the
Trustee sought to have the mortgage declared null and void, or
alternatively, conveyed to the Chapter 11 Trustee, or, as a further
alternative, held in constructive trust for the Jeremiahs. The
Trustee based his complaint primarily upon Smith's prior
representation of the Jeremiahs and the alleged breach of his
fiduciary duties to his former clients. 
 In addition to the disputed $2.1 million dollar RSS
mortgage, the Center was subject to (1) liens for $850,000 in
unpaid real estate taxes in favor of the City of Providence for the
period 1989 to 1996; (2) a $30,000 lien held by the Providence
Water Supply Board; and (3) a $16,000 lien held by the Narragansett
Bay Commission. The property also has significant environmental
problems which would cost anywhere from $850,000 to at least $1.5
million to remedy. Furthermore, the Center is in deteriorating
condition, particularly the roofs, which need at least a half
million to $1 million of repairs. Finally, pre-petition, unsecured
creditors hold claims for approximately another $75,000, including
$16,000 owed to the United States Coast Guard. 
 The Jeremiahs, on the other hand, contend that the
Center's financial picture is not quite so grim. For instance, they
allege that the real estate taxes can be cut by as much as one-half
because the property is significantly overvalued. They also believe
that the $30,000 Providence Water Supply Board and $16,000
Narragansett Bay Commission liens can be reduced due to errors in
the meter readings and billings. As is common in a Chapter 11
proceeding, the Jeremiahs have no real financial equity in the
Center.
 During the period the Trustee operated the Center, he
earned approximately $5,000 per month "profit." He achieved this
"profit," however, only by not paying any debt service (i.e., the
mortgage), any real estate taxes, or any payments on the Center's
prepetition outstanding obligations. The Jeremiahs dispute the
Trustee's characterization of the poor financial health of the
Center, and raise questions about the Trustee's rent collection and
accounts receivable figures, which they contend would show that the
Center was in better condition than that painted by the Trustee.
 While the adversary proceeding against RSS and Smith was
pending, Ricci submitted a proposal to the Trustee in December
1996, offering to resolve the adversary proceeding and to purchase
the Center. Ricci's offer consisted of a lump-sum cash payment of
$150,000 to the Trustee in exchange for conveyance of the title to
the property and dismissal of the adversary proceeding. This
$150,000 would cover all claims held by unsecured creditors and all
administrative costs of the bankruptcy estate. Ricci's offer to
purchase the Center was subject to all existing liens against the
property (except for the $16,000 lien held by the United States
Coast Guard). To assure the purchase, Ricci placed the full
$150,000 purchase price in escrow pending approval of his offer by
the bankruptcy court.
 Although the Trustee previously had characterized the
adversary proceeding as a "good claim" and thought his chances of
winning it were favorable, he accepted Ricci's offer. He concluded
that it was the only credible plan on the horizon; the Jeremiahs
had not submitted a viable alternative. Thus, the Trustee filed a
Notice of Intended Sale and Application to Compromise with the
bankruptcy court. He sent a copy of this notice to all creditors
and interested parties. The notice required that any party
objecting to the proposed sale and compromise file an objection
with the court by February 7, 1997, and that any higher bids be
submitted by that same date along with a 5% deposit.
 No creditors objected to the Trustee's proposed sale and
compromise, nor did anyone, including the Jeremiahs, submit a
competing offer. On the last day permitted, February 7, 1997,
however, the Jeremiahs filed an objection and sought additional
time to make a counteroffer. The basis for their objection was that
the Ricci proposal would deprive them of their property and that
"the alleged wrongdoers[- Smith and Ricci -]would be rewarded for
their acts." The Jeremiahs repeatedly assert or imply throughout
their brief that Smith is involved in the purchase of the Center
along with Ricci. The record, however, contains no evidence to
support this assertion. In their objection, the Jeremiahs merely
stated that they would "arrange to secure payment of 100% of the
outstanding debt to unsecured creditors, and arrange payment of any
and all administrative costs of this bankruptcy, and will presentthis [hypothetical plan] formally to the court [either] [when
ordered by the court or after] the adversary proceeding has been
heard and determined by [the court]." (emphasis added).
 Six days later, on February 13, 1997, the bankruptcy
court held a hearing on the proposal. At that time, the Jeremiahs
objected and again requested additional time to present a
counteroffer to the court. For their accommodation and as an
additional opportunity to purchase the property, the court, over
the Trustee's objections, continued the hearing for six weeks until
March 31, 1997. As a condition of the continuance, the court
required the Jeremiahs to provide the Trustee with sufficient
collateral to fund an alternative proposal. Although the Trustee
questioned the value of the collateral offered, the Jeremiahs
tendered, and the Trustee ultimately accepted, a $175,000 mortgage
on the residence of Andrew and Faith Jeremiah.
 During the six week extension, the Jeremiahs did not come
up with a counteroffer. Not until after the six weeks had expired,
on the morning of the March 31, 1997 hearing, did the Jeremiahs
submit for the first time their "proposal." Undated, unfiled, and
incomplete, the document, entitled "Debtor's Proposal to Purchase
Assets," stated that the Jeremiahs would pay to the Trustee
sufficient funds to pay (1) all pre- and post-petition creditors
excepting those from which they had obtained waivers and made
alternative arrangements and (2) all administrative costs, in
exchange for (1) the Trustee's assignment to them of all assets of
the Silver Spring Center subject to all existing liens, (2) the
court's dismissal of the Chapter 11 petition, and (3) the court
retaining jurisdiction over the adversary proceeding. The proposal,
however, lacked necessary specifics; it had no purchase price, no
time frame for completion, or any statement as to how the proposed
payments would be funded. During this hearing, however, the
Jeremiahs' attorney stated that he possessed a $20,000 bank check;
that he had unspecified, undocumented, "written agreements" that
$50,000 would be wired to his account before noon that day; that he
could sell within two weeks an undocumented and unsubstantiated
Rolls Royce for $40,000; and that he had signed waivers from
several unsecured creditors totaling almost $70,000. 
 The Trustee recommended that the court reject this last-
minute proposal as inadequate. The court agreed with the Trustee's
assessment, concluding that the Jeremiahs' "constant last-minute
efforts . . . just d[id]n't cut it." The court then accepted the
Trustee's business judgment, and "reluctantly" approved the sale
and compromise. In its brief, two-page order that followed, the
court explained that its approval was based on the reasons argued
by the Trustee, the United States Trustee, and counsel representing
Ricci, and that the proposed compromise and sale were in the best
interest of the estate. The court concluded that the Trustee's
proposal constituted a reasonable exercise of his business
judgment.
 The Jeremiahs appealed to the district court and obtained
a stay. Subsequently, the district court duly entered a judgment
and order vacating the stay, and affirming the bankruptcy court's
approval of the sale and compromise. The Jeremiahs again appealed
and moved that this court waive the requirement of a supersedeas
bond to stay the proposed sale. This court denied their motion. On
March 5, 1998, the Trustee conveyed all his right, title, and
interest in the Silver Spring Center to S.S.C. Realty Associates,
as the nominee of William Ricci.
 II.
 Although both parties raise several issues on appeal, the
dispositive issue is whether, in light of the credible allegations
of fraud surrounding the Center's mortgage, the bankruptcy court's
approval of the Trustee's proposed sale and compromise to Ricci
constituted an abuse of the court's discretion. We discuss the
subordinate issues briefly before addressing the abuse of
discretion question.
 A. Jurisdiction
 The Jeremiahs' first argument is that the bankruptcy
court lacked jurisdiction because it had not yet determined the
status of the adversary proceeding pending against Smith and RSS.
This is so, they contend, because a bankruptcy court, as a court of
equity, lacks jurisdiction to further a fraudulent purpose.
Although this court's opinion in In re Coastal Cable T.V., Inc.,
709 F.2d 762, 764 (1st Cir. 1983), seems to lend some credence for
that premise, as will be discussed more fully when resolving the
abuse of discretion issue, the bankruptcy court's order did not
result in "injustice or unfairness . . . in the administration of
the bankruptcy estate." See id. The Trustee and the court both
were fully aware of all of the allegations of fraud surrounding
RSS's acquisition of the Center's mortgage and Smith's alleged
unethical involvement. Unlike the situation in Coastal Cable, the
bankruptcy court here held several hearings on the record during
which the issue was discussed extensively and during which the
court even assumed the Jeremiahs' success in the adversary
proceeding against RSS and Smith. Nonetheless, after hearing
testimony and evaluating all the facts, the court reached the
considered conclusion that Ricci's proposal was in the best
interests of the estate. Thus, only then did the court
"reluctantly" approve the sale and the compromise of the adversary
proceeding.
 Moreover, although Coastal Cable requires that "there
must be some relation--at least an arguable relation--between the
Chapter 11 plan and the reorganization-related purposes that the
Chapter was designed to serve," see id. at 764, here the Jeremiahs
presented neither a live plan of reorganization nor a comparable
purchase offer for the property. As the bankruptcy court found, the
Jeremiahs' last-minute efforts and proposal were without merit;
they just did not "cut it." No one used the court to further
fraudulent conduct; every effort was exerted to achieve the best
interests of the estate. Thus, the issue here is not whether the
court was being used to further a fraudulent purpose, and thus
potentially lacked jurisdiction, but did the court abuse its
discretion in concluding that the sale and compromise--the only
credible proposal on the table--were in the best interests of the
estate.
 B. Sufficiency of the Record
 The Jeremiahs' second argument is that the record is
insufficient to demonstrate that the bankruptcy court made a
thorough analysis of all the relevant factors and an informed,
independent judgment. The record, however, is replete with evidence
that the court made a thorough analysis, fully and patiently
informed itself of the relevant facts, and carefully exercised
independent judgment. It held at least five on-the-record hearings
over many months, during which both parties repeatedly presented
their respective positions to the court in detail. The court also
provided the Jeremiahs, over the objections of the Trustee, with
an extension of six weeks to give them an opportunity to present a
workable solution before approving the sale and compromise.
 Moreover, the requirement that the court's judgment be
independent does not necessarily mean that it cannot match the
judgment of the Trustee. We do not agree with the Jeremiahs that
the judgment of the court cannot be independent unless it differs
from the Trustee's. Although the court accepted the proposal and
reasoning of the Trustee, it did so only after searching hearings
involving all parties and its independent conclusion that the
proposal was in the best interest of the estate.
 Finally, though the court adopted the reasons proffered
by the Trustee and even "welcome[d]" his business judgment, the
court did summarize on the record its reasons. During the March
31st hearing, the court stated its conclusions in over one and one-
half pages of recorded transcript which unmistakably demonstrated
that it was exercising its own judgment, even though identical to
the Trustee's.
 We believe that the bankruptcy court informed itself of
the relevant factors and established a sufficient basis on which it
exercised its own independent judgment.
 C. Good Faith Purchaser Under Section 363(m)
 The Trustee correctly argues that under section 363(m) of
the Bankruptcy Code this court cannot invalidate the Trustee's sale
to Ricci/SSC Realty if Ricci qualifies as a good faith purchaser.
Although the Trustee argues that this is the case here, section
363(m) is not applicable to the facts of this case. "A 'good
faith' purchaser is one who buys property in good faith and for
value, without knowledge of adverse claims." In re Mark Bell
Furniture Warehouse, Inc., 992 F.2d 7, 8 (1st Cir. 1993) (emphasis
added) (citations omitted). Here, it is unquestionable that Ricci
had knowledge of the adverse claim--i.e., the adversary proceeding-
-instituted by the Trustee against him. The Trustee cannot defeat
the Jeremiahs' claim by draping Ricci in the garment of a good
faith purchaser when he clearly had notice and knowledge of the
very same claim which lies at the heart of the disputed compromise
before us. Notwithstanding that Ricci/SSC Realty is not a good
faith purchaser under 363(m), we believe that this conclusion
does not affect our analysis.
 D. Did the Bankruptcy Court Abuse Its Discretion?
 On appeal from the district court, we independently
review the bankruptcy court's decision. The approval of a sale of
a bankruptcy estate's assets or a compromise of an adversary claim
is within the sound discretion of the bankruptcy judge, and we will
not upset it absent a clear showing that the bankruptcy judge
abused his discretion. See Jeffrey v. Desmond, 70 F.3d 183, 185
(1st Cir. 1995) (internal citations omitted) (citing In re Anolik,
107 B.R. 426, 429 (D. Mass. 1989) (collecting cases)); see also In
re Thrifty Liquors, Inc., 26 B.R. 26, 28 (D. Mass. 1982) ("The
Court is loath to interfere with the Trustee's business decision in
regard to . . . the propriety of the proposed sale.").
 In deciding whether to approve a compromise of a lawsuit,
the specific factors a bankruptcy court should consider include:
"(i) the probability of success in the litigation being
compromised; (ii) the difficulties, if any, to be encountered in
the matter of collection; (iii) the complexity of the litigation
involved, and the expense, inconvenience and delay attending it;
and, (iv) the paramount interest of the creditors and a proper
deference to their reasonable views in the premise." See Jeffrey,
70 F.3d at 185. The court's consideration of these factors should
demonstrate whether the compromise is fair and equitable, and
whether the claim the debtor is giving up is outweighed by the
advantage to the debtor's estate. Although Jeffrey involved a
Chapter 7 petition, courts routinely use these same principles in
the Chapter 11 context. See, e.g., In re Pennsylvania Truck Lines,
Inc., 150 B.R. 595, (E.D. Pa. 1992).
 In the instant case, the record amply demonstrates that
the court carefully weighed these factors in deciding to approve
the sale and compromise. The court did not act mechanistically or
impulsively. It realized that the Trustee assumed that the
adversary litigation would not be complex and that he probably
would triumph. However, even if the Trustee were successful in the
adversary proceeding, there was a substantial risk that RSS would
retain a claim for "at least $200,000 against the estate," the
amount it had paid the New Bedford Bank for an assignment of the
original mortgage. The Jeremiahs, by contrast, did not address this
concern. Thus, because the Jeremiahs had no financial equity in the
property and did not put forward a credible plan or offer, the
dispositive issue for the court ultimately was whether the
compromise and sale were in the best interests of the estate. The
court reasonably concluded that they were.
 Although the bankruptcy court was faced with some
unsavory and troublesome circumstances, in reality, it had no
choice but to approve the proposal. Regardless of the court's
reluctance to approve a sale of the property to a purchaser of
questionable repute and allegedly unethical conduct in the
acquisition of the mortgage, any other decision might have been
costly to the estate and an abuse of the court's discretion. The
Center had been in and out of Chapter 11 bankruptcy for
approximately nine years. A trustee had been appointed and was
running the Center--extraordinary in a Chapter 11 proceeding, seeDavid G. Epstein, et al., Bankruptcy, 10.8, at 745 (1993)--
because the Jeremiahs were in prison for dealing drugs out of the
Center and unavailable to run it themselves. There appeared to be
no end in sight.
 The Center also was woefully behind in its tax and
utility payments. It had not made a real estate tax payment to the
City of Providence since 1989 and was subject to real estate tax
liens that were rapidly approaching $1 million. In addition, the
Providence Water Supply Board and the Narragansett Bay Commission
held $30,000 and $16,000 liens, respectively, on the property. The
Center also has at least $850,000 to $1.5 million worth of
environmental problems, is in deteriorating condition, with the
roof alone needing between a half million and $1 million worth of
repairs. In addition, prepetition, unsecured creditors held claims
for approximately another $75,000. Although the Trustee, in
operating the Center, had an illusory "profit" of $5,000 per month,
this was achieved only by not making payments on the mortgage, and
by withholding payment of real estate taxes and any payments
towards any of the Center's prepetition outstanding obligations.
Furthermore, it appears that much-needed repairs and capital
improvements were ignored.
 Since the time the Jeremiahs sought Chapter 11 protection
in 1994, they unfortunately never once put forward a credible
proposal to reorganize the Center's debts and to resume its
operation. Even their so-called "proposal" submitted at the March
31st hearing lacked specific information regarding the value of the
proposal, how it would be funded, or even the time frame during
which it would be implemented. Furthermore, even the
representations of the Jeremiahs' counsel were lacking in
specifics, referring mostly to undocumented and unverifiable monies
and assets to be pledged in the future. Moreover, after notice by
the Trustee of the proposed sale and compromise, no creditor
objected. In the end, after marketing efforts, the targeting of
other potential buyers, and the holding of discussions with others,
Ricci made the only credible proposal. Faced with these facts,
which are fully documented on the record, the court appears to have
made the only reasonable choice available in approving the proposed
sale and compromise.
 Finally, although the court fully adopted the reasoning
of the Trustee in its final order and judgment, it articulated some
of its own reasons for approving the plan during the March 31st
hearing.
 In this case I welcome the Trustee's
 business judgment test. I think I've heard
 about as much as can be said in behalf of the
 Jeremiahs and the debtor in this case. This is
 a situation that no one in their right mind
 could possibly like if they're looking at it
 from an objective position. It's been--it's
 been unpleasant. It's been questionable.
 Ethics are totally missing--I don't know when
 this--the whole thing originated, but it's
 just a [sic] unsavory situation that has come
 down to the place where it is. [The debtor's
 attorney's] efforts to--in his client's
 behalf--and nobody questions his right or his
 obligation to do that--would merely place us
 back where we were, moving along with the
 litigation, before the Trustee comes up with
 this offer. It's the only show in town. It's
 the only viable show in town.

(App. 141-42).
 In sum, the court made an informed, reasoned, and
independent decision to approve, albeit reluctantly, the
Trustee'application to compromise and sale. We cannot conclude that
it amounted to an abuse of the court's discretion.
 III.
 Accordingly, we hold that despite the debtor's
allegations of fraud and unethical behavior leveled at the
purchaser, the bankruptcy court's approval of the Trustee's sale
and compromise did not amount to an abuse of the court's
discretion. The court regrettably lacked a realistic alternative
proposal and it fairly considered the merits of the proposal put
forward by the Trustee and the realities of the estate's desperate
situation. The district court's judgment affirming the judgment of
the bankruptcy court is affirmed. Each side to bear its own costs.