**In re COASTAL CABLE T.V., INC., Debtor.**

**Gerald CONNELL, Robert Doorley, Robert L. Gordon, James Canning, Joseph Caranci, and Sidney Desotnek, Plaintiffs,**

**and**

**James M. Hook, Plaintiff-Intervenor,**

**v.**

**COASTAL CABLE T.V., INC., Berkshire Cable Television Co., Inc., Paul E. Burke, George L. Sisson, Jr., Leonard Rubin, and James E. Macdonald, Defendants,**

**and**

**George Newbury, Additional Defendant.**

**C.A. No. 83–0432 S.**

United States District Court, D. Rhode Island.

Oct. 19, 1984.

Hinckley & Allen, Michael P. DeFanti, Robert C. Corrente, Gerald J. Petros, Providence, R.I., for plaintiffs Gerald Connell et al.

Peter F. Dow, Boston, Mass., Michael A. DeSisto, Providence, R.I., for plaintiff-intervenor James M. Hook.

Edwards & Angell, Providence, R.I., E. Colby Cameron, Joseph Cavanagh, Jr., Cain, Hibbard, Myers & Cook, Frederick M. Myers, John F. Rogers, Ronald E. Oliveira, Pittsfield, Mass., for defendants Berkshire Cable Television Co., Inc. and James E. Macdonald, Jr.

Zietz, Mittleman & Webster, Richard S. Mittleman, Peter G. Berman, Mortyn Zietz, Providence, R.I., for debtor-defendant Coastal Cable T.V., Inc.

Letts, Quinn & Licht, Frank Licht, Daniel J. Murray, Providence, R.I., for defendant Paul E. Burke.

DiSandro-Smith & Associates, P.C., Z. Hershel Smith, Providence, R.I., for defendant George Newbury.

Tillinghast, Collins & Graham, Robert P. McGarry, Brian J. Spero, Providence, R.I., for defendant George L. Sisson, Jr.

John Kenney, Peacedale, R.I., for defendant James E. Macdonald.

OPINION

SELYA, District Judge.

This case comprises a salmagundi of questions relating to the ownership of original issue stock in Coastal Cable T.V., Inc. (Coastal), a Rhode Island corporation, and to the validity of the sequential transfers of ninety percent of Coastal's issued and outstanding shares by Paul E. Burke to George L. Sisson, Jr., and thereafter by Sisson to Berkshire Cable Television Co., Inc. (Berkshire). This court's jurisdiction derives from the creative exercise by the Court of Appeals for the First Circuit of its broad supervisory powers. *In re Coastal Cable T.V., Inc.*, 709 F.2d 762, 765 (1st Cir.1983) *(Coastal I)*.

The events which gave rise to the litigation have a long and tortuous history. They occurred along a temporal span which began in 1972. In various incarnations, the underlying controversy has been the subject of a host of administrative and judicial proceedings, federal and state, including a bankruptcy petition initiated in June, 1981 in the United States Bankruptcy Court for the District of Rhode Island, *In re Coastal Cable T.V.*, Bk. No. 81–00501, and an adversary proceeding fostered by the instant plaintiffs within the contours of the bankruptcy action, *Connell v. Coastal Cable T.V.*, A.P. No. 81–0249. In July, 1982 the bankruptcy court, over the plaintiffs' objections, approved a proposed sale of Coastal's only asset, its right to operate a cable television franchise. The bankruptcy ap-

pellate panel affirmed. *In re Coastal Cable T.V.*, 24 B.R. 609 (Bankr.1st Cir.1982). The First Circuit, however, vacated the order and tossed the whole of this rather slippery ball of wax to this court with "instructions to determine the appropriateness of continued bankruptcy court proceedings." *Coastal I*, 709 F.2d at 765.

Implementation of this apparently straightforward but deceptively intricate mandate was easier stated than accomplished. The concerns underlying the First Circuit's transfer of the case are variously limned in *Coastal I*. Judge Breyer noted, inter alia, the need for a determination as to the actual ownership status of Coastal, *Coastal I*, 709 F.2d at 764; the uncertainty surrounding the legitimacy of the alleged debt which precipitated the bankruptcy court petition, *id.* at 765; the desirability of "determining the underlying facts and their relation" to the charges of fraud, *id.;* and the necessity *vel non* "for a bankruptcy proceeding once the state-law ownership question [anent Coastal's stock] is resolved." *Id.* This court and the parties wrestled with the perplexing task of developing a sensible ad hoc framework within which to resolve these issues; and the court, on April 16, 1984, entered a pre-trial order custom tailored to fit the circumstances. Following further hearings, that order was modified in certain respects by a pre-trial order entered on June 4, 1984.[1]

Pursuant to the June 4 order, the parties waived the right to present additional evidence in open court, and stipulated that a four-volume joint appendix would constitute the record in this case, and would furnish the factual predicate for the court's decision. An elaborate briefing schedule was devised. The litigants further agreed to defer, until after resolution of the ownership issue, the question of the validity of the debt underlying the bankruptcy petition.[2] The June 4 order limited the scope of the present inquiry to four weight-bearing bones of contention, viz.:

1. Was Paul Burke the owner of the Coastal stock on January 28, 1980?

2. If not, was Paul Burke nevertheless in such a position that he could transfer ownership thereof to a bona fide purchaser for value without notice?

3. If the answer to question 2 is "yes," was George Sisson a bona fide purchaser on January 28, 1980?

4. If the answer to question 3 is "no," was Berkshire a bona fide purchaser from Sisson, as of June 26, 1981?

The parties' compendious briefs and reply briefs and the joint appendix having been filed and meticulously reviewed by the court, and oral arguments having been heard on July 17, 1984, this opinion constitutes the court's findings of fact and conclusions of law on the case stated as required by Fed.R.Civ.P. 52(a). As such, the simplification and telling of a most complex tale becomes obligatory.

## I.

### A. *The Tangled Web They Wove.*

This saga began in 1972, when the Rhode Island Public Utilities Commission (PUC)[3] announced that it would consider applications for permits to construct and operate community antenna television systems—

---

1. Inasmuch as the June 4 order subsumes the April 16 order, and incorporates by reference all provisions of the latter not expressly altered by the former, the court will henceforth refer to the merged decrees as "the June 4 order." The June 4 order was entered with the acquiescence and consent of all parties.

2. The parties opined that it was unnecessary to undertake an analysis of the legitimacy of the debt at this time, on the thesis that resolution of the four questions actually posed would either be de facto determinative of that issue, or at most, would render any remaining debt-related

inquiry subject to facile disposition. *See* joint letter from counsel to the court, May 29, 1984, at 2 ("we feel that the validity of Coastal's debt is essentially a function of the stock ownership question.").

3. The Rhode Island Public Utilities Commission and the Rhode Island Division of Public Utilities and Carriers are referred to jointly herein as the PUC. The court realizes that the two may be distinct. But, for purposes germane to this case, any such distinction is one bereft of a difference. *See* R.I.Gen.Laws, Title 39.

more commonly known as CATV or cable television systems—in Rhode Island. The right to provide CATV service was viewed by many as an economically attractive proposition. In the Rhode Island market, the PUC had divided the state into seven cable television service areas. The instant brouhaha involves the seventh sector, comprising Newport, Middletown, Portsmouth, Tiverton, and Little Compton (the Newport franchise). After segmenting the cable television pie on paper, the PUC then entertained simultaneous applications from prospective permittees for any and all of the designated service areas.

A group of Rhode Islanders with diverse occupational backgrounds, all of whom had strong ties to the Newport County area, were among the many applicants for the Newport franchise. They applied in the name of Coastal Cable T.V., Inc. At their instance and request, Coastal was incorporated in Rhode Island on February 9, 1972 by defendant Paul E. Burke. Burke, a Newport attorney, was a social and business acquaintance of several of the Coastal organizers.

Initially, seven people agreed orally to pledge $50,000 each to the venture. Each subscriber was to receive a one-tenth ownership interest in Coastal. The remaining thirty percent was to be held in reserve for additional capital infusions and the like. It is well to observe, early on, that the legal affairs of Coastal were from its very inception characterized by a remarkably casual lack of documentation. True to this lackadaisical pattern, the pledges were never reduced to writing, and the plaintiffs (all of whom claim to be subscribers, and some of whom claim to be founders) never signed any formal subscription agreements.[4] The understanding was that if Coastal won the franchise award, the investors would then ante up their pledged dollar contributions. These amounts were an integral part of the initial, prospective financing plan which was presented by Coastal to the PUC in the course of the permit chase.

The original seven organizers included plaintiffs Gerald Connell, James Canning, Joseph Caranci, and Sidney Desotnek, in addition to Hickman Price, Harold McCormick, and James Hook. Price subsequently moved to Florida and transferred his interest to Connell. McCormick also withdrew; plaintiff Robert L. Gordon replaced him. Gordon, like his predecessor in interest, had solid Newport-area affiliations. Hook's involvement was always as a nominee for the defendant George Newbury.[5] Newbury was among the original organizers, but for personal reasons chose to maintain a profile so low as to approach anonymity. Plaintiff Robert Doorley joined the group a short while after the original participants. Having pledged $150,000 to Coastal, Doorley claims that he is entitled to a thirty percent interest. Several of the plaintiffs also contemporaneously contributed services to Coastal and/or defrayed incidental expenses for the corporation. Desotnek, for example, donated survey work.

At the time they succumbed to the siren song of the state's CATV sweepstakes, most of the plaintiffs were experienced

---

**4.** It is plain that the organizers at all times believed that they were fully committed to the venture, and the court so finds. Sidney Desotnek illustrates this point. He certainly seemed fully cognizant of his pledge. This was evidenced clearly by his letter dated August 11, 1972 to the PUC Administrator, which assured the Administrator that the obligation was within his means.

**5.** Hook's party status remains a riddle within an enigma within a mystery. He began his involvement in Coastal-related litigation as the plaintiff in a state court suit. That complaint, C.A. No. 81–2357, filed pro se, named Burke, Coastal, and Sisson as defendants. Hook alleged entitlement to ten percent of the Coastal shares as Newbury's nominee. Because he had filed the state suit, the plaintiffs here, endeavoring to bring all outstanding claims together, named him as a defendant in their second amended complaint. He has of late—in his final two briefs—begun styling himself as a plaintiff. And, his claim—as he now presents it—logically aligns him with the plaintiffs herein. The court, burdened with a plethora of more substantive issues in this dedalian litigation, has hacked its own swath through the procedural thicket and has opted to treat him as a plaintiff-intervenor.

businessmen. Certainly, none was a tyro. Be that as it may, they blithely assumed that Burke would attend to the corporate formalities. No shareholders' meetings or directors' meetings were called or attended by the plaintiffs during the seven years following incorporation and none of the plaintiffs ever received a Coastal stock certificate. Yet, for many moons, not a murmur of protest was heard. Blind faith and childlike trust were the hallmarks of Coastal's early days.

Their attorney, Burke, also took a markedly laidback approach to corporate niceties, at least for a substantial period of time after Coastal's formation.[6] None of the principal corporate documents, such as the stock certificates, minutes of the incorporators' meeting, or shareholder actions by consent, were seasonably compiled. Although there are hints that some start-up paperwork may have been assembled in 1974, that has not been established. It seems probable that most, if not all, of the basic instruments were not prepared until 1979. The court so finds.

In 1972, Coastal submitted its application for the Newport franchise to the PUC. It is abundantly clear that the proffer was made on the premise that the organizers were the main beneficial owners of the applicant. Two of the letters included with the application referred to Coastal's multiple owners. By way of illustration, one stated:

> The principals of the applicant corporation are residents of Newport County and presently own and operate established businesses within the county. Being local businessmen, we are aware of the local requirements. . . .

On May 31, 1972, Coastal filed its written testimony with the PUC. Although the precise extent of his contribution is unclear, Burke surely participated in the preparation and filing of the materials. The opening statement reiterated that the "principal stockholders are all Rhode Islanders who are engaged in varying businesses and professions in the Rhode Island community," and referred to "shareholders' input and pledges." Connell's sworn testimony mentioned the "personal pledges to the corporation;" and, this document was notarized by Burke. A myriad of additional items, many of which incontrovertibly evidence Burke's knowledge of the contents, refer in a variety of settings to the "principals" of Coastal.

Beginning in June, 1972, Coastal took part in a series of live evidentiary hearings before the PUC. Identifying himself as the "attorney for Coastal Cable T.V.," Burke represented the corporation at Coastal's initial hearing on June 14. Subsequently, Burke introduced Joseph Going—another Newport-area attorney—as co-counsel to assist him with the Coastal work. Going appeared for Coastal at the next hearing, on August 11, 1972.

Plaintiff Connell was Coastal's witness at the August hearing. Responding to questions from Going, Connell identified himself as an officer and director of Coastal, and catalogued the other officers and directors as comprising Price, Hook, Canning, Caranci, Desotnek, and Gordon. The following colloquy ensued:

> *Going:* Would you kindly tell us the ownership interest and who holds it in the corporation, and what is the extent of this interest?
>
> *Connell:* The previous 7 names I have just mentioned have a 10% ownership of equal value totalling 70%. We have retained in the treasury 30% for future stock options . . . or equity financing. . . .[7]
>
> *       *       *       *       *       *
>
> *Going:* Referring to this more or less initial requirement of $2.3 million, would

---

6. At one point, Coastal's corporate charter was forfeited because Burke failed to file annual reports with the Secretary of State. He finally submitted them all in May, 1979. A certificate of good standing was eventually issued under date of November, 1979.

7. Doorley later pledged $150,000 for the remaining thirty percent. He also furnished $5000 which was used to open Coastal's bank account.

you indicate to the Commissioner how that financing would be obtained and what participation individual stockholders of your corporation are prepared to make towards that end?

*Connell:* The directors are prepared and have made pledges totalling $350,000...

In answer to inquiries from other counsel at the hearing, Connell testified that he believed that stock had been issued to the directors. Going indicated his willingness to submit written confirmation of that actuality if the Administrator so required.

The hearings concluded and a two-year period of relative quiescence ensued. During this hiatus, Burke claims to have reconstituted Coastal's board of directors and officers in January, 1974. One step in his supposed reorganization was to make himself president. Apparently, he kept his own counsel and failed to notify anyone concerned about the changes. The action was allegedly accomplished by means of a handwritten note which was filed away until 1979, when Burke had it typed, he says, in response to the final PUC decision. But, the PUC awards, as confirmed, were not made public until October, 1979—nine months after Burke contends that the shift was corroborated. The court finds that no such realignment occurred in 1974; and that, when typewriter was put to bond paper some years later, the product was a recent contrivance, not merely the memorialization of a *fait accompli.* Burke was never lawfully authorized to oversee this devious version of intra-corporate musical chairs.

In November, 1974, the Newport franchise was first awarded to Coastal. The PUC Administrator issued a lengthy omnibus opinion covering the certification of various sectors within the state. In the four pages which were devoted directly to Coastal, the Administrator stressed the importance of roots in the community. He specifically noted Coastal's "broad local actual ownership." Denouncing "trafficking" in certificates, the Administrator set out a strict prohibition against any form of transfer of permits, or effective control thereof, without prior approval from the PUC. It is plain to the court that the administrative largesse bestowed upon Coastal was inextricably intertwined with the representations that the Connell group controlled the majority interest in the corporation. Burke claims that, to the best of his recollection, he never read the four pages relating to Coastal's award and was, therefore, unaware of the Administrator's heavy reliance on Coastal's ownership structure in awarding the franchise. That claim is as empty as a beggar's bequest.

Burke neglected to call a meeting to inform the board of directors that Coastal had prevailed in its quest. He single-handedly filed a letter of acceptance with the PUC and signed it as attorney for Coastal, not as president. A pause ensued. (The mills of the bureaucrats grind exceedingly slow.) The entire process stalled for several years while a number of the unsuccessful cable applicants appealed various portions of the omnibus decision first to the state superior court and then to the Rhode Island Supreme Court. Negotiations among the legion of parties in interest were sporadically conducted for several years. It was not until October 29, 1979, however, that a state-wide accommodation was reached; the matter was then remanded by stipulation and order to the PUC with a directive to implement the 1974 awards. The grant of the Newport franchise to Coastal was thus confirmed.

Between 1974 and 1979, numerous firms interested in purchasing Coastal, in financing its operations, or otherwise in helping themselves to a piece of the perceived pie, contacted representatives of the corporation. This correspondence reflects a generally held understanding that Connell was the person in charge and that Coastal was controlled not by a single individual, but by a group of principals. Nor does anything in the record indicate that anyone involved attempted to dissuade anyone else of the accuracy of these beliefs.

In 1978, defendant James E. Macdonald, then president of defendant Berkshire, opened negotiations with various cable ap-

plicants. The record suggests that Macdonald then believed Coastal to be owned by a number of stockholders, and the court so finds. In a letter on Berkshire stationery addressed to Going, under date of August 29, 1978, Macdonald referred to "the Coastal stockholders and/or individual investors." He expressed his desire to discuss "some sort of tentative arrangement with each member of [the] group."[8] It is true that, in later testimony, Macdonald claimed that he held no belief whatsoever at that time either as to the identity of Coastal's shareholder(s) or as to whether or not Coastal had more than one shareholder. But, this testimony was inherently incredible. Macdonald was intimately familiar with the cable television situation in Rhode Island. He had applied for the Bristol/Warren franchise area in 1972. And, he played a prominent role in the negotiations that settled the overall cable controversy on the brink of adjudication by the state supreme court. Thus, his 1978 reference to the Coastal "group" was consistent with the information about Coastal to which he doubtless had become privy, particularly through the medium of the PUC hearings and the later statewide bargaining.

Sisson was also deeply involved with the Rhode Island CATV scenario from its inception. Indeed, in his 1974 award report, the PUC Administrator lauded Sisson's expertise and thanked him for his assistance. In addition to holding an executive position with the Westerly permit winner and Providence-area loser, Sisson served as a consultant to a Woonsocket applicant and to Newport Cable TV, an unsuccessful bidder for the Newport franchise. He, too, was a prominent actor in negotiating the statewide settlement agreement. In early 1979, on behalf of Colony Communications, Inc.

(Colony), a subsidiary of the Providence Journal Company, Sisson approached Going about the possibility of acquiring Coastal. After some preliminary sparring, Sisson's attorneys sent Going a letter outlining the proposed purchase and sale. A file memorandum written by Going regarding the transaction indicated that Macdonald had been apprised of the situation.[9]

Going had the agreement retyped on his own letterhead and dated April 24, 1979. The contract provided for the sale by Coastal of ninety percent of Coastal's shares to Colony. By any account, this was a peculiar arrangement: Coastal did not own ninety percent of its stock. The contracting parties nonetheless understood that the deal contemplated the sale of shares; indeed, the agreement specifically alluded to the "selling shareholders." Burke executed the paper on Coastal's behalf—but did not purport to specify the capacity in which he signed.

Sisson's attorneys then sent a form of letter agreement to Going to be signed by Colony and "each of the individual shareholders of Coastal." The cover letter, dated May 4, 1979, represented that the attorneys were acting at Sisson's request. Explaining that blanks in the forms were for the names of individual shareholders, the number of shares each was selling, and their allocable portions of the total purchase price, the letter went on to request that Going supply a list of the shareholders, their addresses, and the number of shares held by each. According to Sisson's testimony, he did not believe that Going was a shareholder at the time the agreement was signed and he had no idea whether Burke was a shareholder. He never received any letter agreements or compara-

---

8. Going claims that he perceived no inconsistency between the plaintiffs' group ownership and Burke's claimed sole shareholder status. The court demurs. The juggling of two such antithetic notions constitutes a remarkable feat, reminiscent of the heyday of P.T. Barnum. While this litigation indeed possesses some of the trappings of a circus, Going's clownish ef-

fort to reconcile irreconcilable facts rings no bells.

9. Macdonald and Sisson were, at the time, jointly enmeshed under Berkshire's corporate umbrella. Both men were officers and directors of that corporation. In addition, Sisson owned fifty percent of Berkshire's stock; the remainder was held by Macdonald's immediate family.

ble instruments completed by any of the Coastal shareholders.

Going claimed that he believed Burke's signature was sufficient because Burke was the only shareholder. Therefore, Going never responded to the request for the list of shareholders. But, in another of the string of telling inconsistencies which infect the defendants' case, Burke testified that as of April, 1979 he had not informed Going of his sole shareholder status.

No action was taken on the April, 1979 Coastal pseudo-agreement: no shares were transferred to Colony, no money was paid to Coastal. On November 15, 1979, Colony wrote to Burke to advise him that, by instrument of the same date, it had assigned whatever rights and/or obligations it might conceivably have had under the April agreement to Sisson personally. The assignment between Colony and Sisson recited a consideration of one dollar. According to Sisson, it was made coincident with his separation from Colony's service: no discussion took place, Colony simply transferred the rights to him when he departed.

On the same date, Sisson constructed a document for Going to use in Coastal's application for the confirmatory (i.e., post settlement) PUC certificate. Sisson wrote:

Coastal Cable Television, Inc., has had no changes in stockholders or corporate structure since our original application and grant.

We have arranged to finance our construction through stockholder contributions and bank loans.

The original application, testimony, and grant, of course, all identified or tended to identify the plaintiffs as the shareholders. Sisson testified, however, that he was still unaware of Coastal's ownership structure at this advanced date. That testimony, given the totality of the circumstances, strains credulity well past any reasonable breaking point.

In late November, Sisson began to clamor for a closing on the Coastal acquisition. His initial demand for signed shareholder agreements having been ignored, he reasserted it in November. The November,

1979 letter, which emanated from his counsel, recognized that a new document would have to be drafted to provide for the sale of shares by the shareholders:

[P]ending preparation and execution of the contract of sale and purchase between the Coastal shareholders on the one hand and George Sisson and his associates on the other hand, George has requested that he receive a letter of commitment from each individual Coastal shareholder to the Purchase and Sale agreement.

Please note that none of this request is new; by my letter of May 4, 1979, I made the same request....

Going ignored this request as well.

The plaintiffs were largely ignorant of any possible deal with Sisson. Colony informed Connell of its offer in April, 1979. Connell thereafter discussed the offer with four of the other plaintiffs during the summer of 1979. All were either opposed to, or noncommittal about, the sale. Connell was not aware at this time that Burke, purportedly acting in Coastal's behoof, had already signed the April agreement.

Suggesting that if the Providence Journal Company (which operated the state's largest newspaper) failed to secure the Newport franchise, the settlement of the statewide appeal would not go through. Burke and Going urged the plaintiffs to sell to Colony. Thus, when the stipulated resolution of the appeal was announced in October (prior to any further negotiations with the Journal), Connell was confused. Hoping to clarify the situation, he arranged a summit conference of sorts.

On November 15, 1979, Burke, Going, Connell, Doorley, and Joseph Chaves met at Going's home. The record is tenebrous as to when and why Chaves, a Newport county businessman, state senator and recognized political force, began to dance in the Coastal cotillion. Burke and Going showed Connell and Doorley a blank copy of the Coastal option, asked for attorneys' fees of approximately $40,000, and asserted that they, too, were Coastal sharehold-

ers. No progress was made; Connell and Doorley remained unmoved. A second meeting, to involve a larger group of concerned parties, was scheduled for November 30. Going expressed his inquietude to Burke that, if Doorley remained opposed to the transaction, Colony might be of a mind to sue the attorneys, personally.[10] The importance which Going attached to Doorley's consent itself belies the notion that Burke—and Burke alone—owned all of Coastal's shares. It similarly undercuts Going's protestations that he thought such was the case.

The November 30 meeting took place. It was attended by Burke, Going, Connell, Doorley, Desotnek, Chaves, Newbury, and McCormick. The meeting went badly from the start; Newbury allegedly compared Going with an unattractive breed of small furry animal for attempting to claim an ownership interest. Going produced the shareholder agreements, but quickly put them back in his briefcase: it was apparent that no one would sign them. Burke accused Connell of trying to euchre him out of his legal fees.[11] The meeting ended in what might politely be described as chaos.

The plaintiffs, convinced that Burke and Going were planning to sell Coastal despite the plaintiffs' vociferous objections and notwithstanding their claims of ownership, determined to take action. In December, Gordon, McCormick, and Doorley wrote to Burke insisting that their shares be issued. Doorley made a similar demand of Going. Canning, who had not attended the November meetings, wrote to Burke suggesting a convocation of the original Coastal organizers to apprise all of them of future plans for the company.

Burke was in a bind at this point. He had committed himself to the Colony/Coastal option. But, the plaintiffs were vigorously advancing their claims of stock ownership and seemed adamant in their refusal to consent to the agreement. The record strongly suggests that Burke and Going were fearful that Sisson might sue them if they failed to consummate the option agreement. The attorneys were now running scared. And, Burke's next two moves escalated the bedlam to new heights.

In a December 13 letter to Connell, Burke offered Coastal to Connell and Doorley for $240,000 (a tidy sum which was to be divided equally among Burke, Going, and Newbury) and a broad-form indemnification. As a practical matter, this proposition made no sense. If Burke was indeed Coastal's sole shareholder, there was presumably no reason for him to forego two-thirds of the sales price. Likewise, if Burke held the shares for Newbury, it is unclear why he and Going should each pocket a one-third share. And, Newbury failed to solve the riddle; he testified that he had never authorized Burke to make such a proposal. This assumed tripartite ownership structure was an entirely new specie: it appeared out of thin air, and hovered, like the storied lady of the evening, without visible means of support. It was, moreover, directly contrary to Burke's testimony that neither he nor Going had any proprietary interest in Coastal.[12] In any event, after Burke had run the proposal up the flagpole, nobody saluted.

Burke's next maneuvre was just as incongruous. Newbury was—according to

10. This session occurred on the very date that Sisson wrote to advise of his assumption of Colony's position vis-a-vis the April agreement. Thus, the participants at the meeting still regarded Colony—rather than Sisson—as the offeror. But, by the time that the follow-up gathering occurred, that situation had clarified.

11. Query: why would a purported sole shareholder who had rendered services to his wholly-owned corporation accuse a non-owner of blocking payment of his fees, and, in effect, demand payment from the non-owner? Answer

(suggested by the evidence and by rudimentary common sense): the purported sole shareholder, wasn't.

12. It is conceivable that, as the plaintiffs asseverate, the real impetus for this outlandish offer was, from Burke's viewpoint, the proposed indemnification with respect to the suit which he feared that Sisson would file. But, while such a speculation constitutes interesting food for thought, it is a side dish at best; it need not be fully digested here.

the plaintiffs' story—an original participant who, for personal reasons, had become involved not under his own name but through his nominee (Hook). Newbury was also Burke's brother-in-law. Burke and Newbury testified that the latter was the founder and sole shareholder of Coastal and that Burke held all the stock in his name for Newbury. In December, 1979 Burke requested and received from Newbury a power of attorney, empowering Burke to do whatever he felt was best with Coastal. The power of attorney, of course, was effective only if, and to the extent that, Newbury controlled Coastal. Its etiology was uncertain. Burke explained that Newbury, because Connell was bothering him, thought that the power of attorney would be to his (Newbury's) advantage. But, Newbury's testimony produced quite a different version: having discussed the situation with Burke and Connell in an effort to understand just what was going on, Newbury finally found out that Burke had committed himself to the agreement and that he would be in serious trouble if it fell through. Consequently, Newbury agreed to send the power of attorney to Burke. The court cannot accept either of these explanations at face value. The court finds that Newbury was never entitled to more than ten percent of Coastal's shares; that Newbury's belated claim of undivided ownership was a fiction, woven by Newbury and/or Burke out of whole cloth, in an effort to extricate Burke from the self-excavated hole in which he found himself; and that the power of attorney was manifestly insufficient to arrogate unto Burke control over Coastal's destiny.

It was in this time frame that Burke must have begun to prepare in earnest for the closing with Sisson. Curiously, he never so much as whispered to Sisson that, as he would thereafter vehemently maintain in litigation, he was holding one hundred percent of the Coastal stock as a trustee of sorts for Newbury. By letter dated December 24, 1979 Connell, Caranci, and Gordon—a majority of the Coastal directors—requested that a board meeting be held the following week. Burke responded by dismissing them all from their posts as officers and directors. Needless to say, he lacked the power lawfully to do so.

Also on December 24, Macdonald, acting for himself and Sisson, penned a note to Connell. The plaintiffs quite rightfully placed great emphasis on this billet-doux. It stated in pertinent part:

George and I are sorry to have missed you once again.

.     .     .     .     .

We picked up an up-to-date of your stockholder list as well as your Officer and Director's list as you filed with the P.U.C.O. We had previously understood that this data was to be furnished to our Attorneys but for some unexplained reason we were not given this information directly.

As I indicated to you last week when we chatted for a minute or two in your office we are ready to close per terms of the existing Option Agreement at Industrial National Bank within twenty-four or forty-eight hours of the issuance of this franchise agreement, assuming that this time and place is 100% convenient to you. I [ ] understood at the time that we discussed this matter last week that you had not talked with Joe Going about this matter since we last talked in the middle of November....

I now have the uncomfortable feeling that someone on your side of the fence who obviously had been approached by Bill Eagan, Continental and others shopping around for a R.I. franchise has tempted one or more of the people in your group to attempt to "renege" on their Option Agreement. I would hope that the good of each of you, that you will realize that there is no way that any intelligent person would permit this type of "double cross".

I do hope that you will personally give me some reassurances that from your personal point of view that you are ready, willing and able to perform on your part of this bargain.

George and I look forward to seeing you immediately after Christmas and clearing this matter up.

Viewed in the albedo of this letter, Sisson's and Macdonald's repeated insistence under oath that they had not the slightest clue as to the identity of the Coastal shareholders constitutes the most brazen sort of impudicity.[13] It is perfectly plain to the court that Macdonald and Sisson were extremely knowledgeable about the internal conflict in which Coastal was embroiled and that they knew full well of the ownership claims of Connell and his allies.

Four days later, the PUC wrote to Burke and Going seeking "information requested earlier on the original major stockholders and any new stockholders" since the 1974 interlocutory permit order was issued. Having been alerted to the PUC's demand for the data, Sisson likewise asked Going (and, indirectly, Burke) to furnish the information. Responding by letter, Going identified Burke as "the original and current sole shareholder" of Coastal.

A number of details, some of which have been discussed *ante*, totally discredit this stance. Additionally, Coastal's tax returns for the years 1975–78, prepared by Burke, named Connell as a stockholder to whom the company owed money. Burke later claimed that he had included Connell as a precaution, in case Connell became a shareholder; but this explanation is far too feeble to be believed. And further, Sisson's attorneys, Messrs. Adler, Pollock & Sheehan (AP & S), invited Connell to the pre-closing meetings with Burke, Going, Sisson, and Macdonald. All in all, Going's statement to the PUC was, at worst, an utter sham; and at best, the merest of velleities. The claim was patently untrue.

The closing on the putative purchase of Coastal by Sisson qua assignee was set for January 28, 1980, at the offices of AP & S. On January 23, 1980, Attorney Orlando Andreoni delivered a letter to AP & S advising them that his clients were the authentic Coastal shareholders and that any sale of Coastal stock by Burke alone would be unauthorized. Because of the importance of the Andreoni letter, its central paragraph is set out below:

We represent Gerald Connell, Robert Doorley and Dr. Robert Gordon who are the majority stockholders of Coastal Cable, Inc. Our clients have been informed by Attorney Burke that George L. Sisson is the beneficiary of an assignment from Colony Communications, Inc. of a sales agreement between Colony and Coastal. You should be advised that we have notified Colony that said agreement was never authorized by the stockholders of Coastal nor was Mr. Burke authorized as attorney to execute such an agreement.

Sisson's attorneys asked Going how they should respond to the letter.

AP & S then proceeded to draft a complaint, verified by Sisson, and a motion for a temporary restraining order aimed at compelling Burke to fulfill the agreement. These documents, which outline the nature of the Connell group's ownership claims, were dated January 24, 1980. They were seemingly part and parcel of an in terrorem strategy and were never filed in any court. The record shows that, prior to the Sisson/Burke closing, the following actors, at a minimum, were well aware of the plaintiffs' ownership claims and of the Andreoni letter: Burke, Going, Sisson, Macdonald, and AP & S.

The "complaint" achieved the end which it was apparently designed to accomplish. Burke consummated the deal on January 28, 1980. The closing documents specifically referred to "the possibility of any adverse judgment or liability [regarding the plaintiffs' claims]." Burke certified to the buyer that these claims were "false." Going certified that Burke's assertions and warranties of ownership were true and complete. Sisson's obligations under every operative document in the closing binder

---

**13.** Indeed, testifying before the bankruptcy court, Macdonald denied ever checking with the PUC for an updated shareholder list.

were uniformly conditioned on the veracity of Burke's representations.

It is interesting to note that the non-negotiable promissory note from Sisson to Burke, granted at the closing, altered the terms of the April 24, 1979 agreement between Coastal and Colony. The requirement that Sisson pay Coastal's share of the state-wide settlement was eliminated. The January, 1980 note made all of Sisson's payment obligations contingent on the PUC's issuance of the final operating certificate to Coastal. But, because the ownership of Coastal had changed without PUC approval (in violation of the state's regulations), the certificate was not likely to issue—at least not without considerable difficulty. Thus, Sisson could reasonably have contemplated that he might never have to pay a thin dime on the note; in point of fact, he has paid nothing to date. Upon resale of Coastal, then, Sisson could potentially realize a return on his investment approaching infinity.

Within weeks of the putative closing, the plaintiffs filed suit in the state superior court against Burke, Sisson, and Coastal seeking to declare the purported sale null and void and to impose a constructive trust on Coastal's shares and upon its sole asset (the Newport franchise). *Connell v. Burke*, C.A. No. 80–537 (R.I.Super.Ct., Prov.County, March 3, 1980). A barrage of depositions and other lawyerly skirmishing followed. Discovery proceeded until late June, 1981, when Berkshire haled Coastal into the bankruptcy court. Four days later, on June 26, Sisson transferred his 2700 shares of Coastal stock to Berkshire. The details of this transaction are recondite at best.[14] Nevertheless, it appears from the closing docket that Berkshire consented to pay Sisson's outstanding legal bills and his other expenses associated with Coastal.

This, on the face of things, was to be the sole consideration for the transfer of his stock. Yet, the letter agreement between Sisson and Berkshire of even date makes no mention of this obligation. Instead, under the agreement between Sisson and Coastal, the latter, for no consideration whatever, agreed to pay all Sisson's debts—the same debts which were to have constituted the consideration for the Sisson/Berkshire sale.

Having inherited all of Sisson's debts in this peculiar fashion, Coastal, via Macdonald, filed a voluntary petition for bankruptcy. In this petition, Coastal listed as its only asset the rights to the Newport franchise. Its only scheduled creditors were Berkshire, several law firms which had represented Sisson and/or Berkshire in connection with the Coastal affair (including AP & S), and J & K Realty (an outfit in which Connell was the principal.

More important, the documents evidencing the Sisson/Berkshire sale contained repeated references to the proprietary claims of the plaintiffs. Indeed, in Sisson's certificate of June 26, 1981, he warranted that he was conveying the shares free and clear of adverse interests,

> subject only to claims with respect to the shares which have arisen or may arise in connection with that Providence County Superior Court, State of Rhode Island Civil Action No. 80–537 entitled *Connell, et al vs. Burke, et al.*

And, even in the absence of such explicit references, there could be no genuine question of notice and knowledge of the claims of the Connell group on the part of either Berkshire or Macdonald. Macdonald knew of the problem prior to Sisson's stock purchase in January, 1980. Furthermore, at the time of Berkshire's purchase, the own-

---

**14.** The conveyance from Sisson to Berkshire was seemingly one element of a broad-scale settlement agreement between them. Berkshire had sued Sisson in a Massachusetts state court, alleging that Sisson had misappropriated a corporate opportunity in acquiring the controlling interest in Coastal. It appears that, at all times relevant to the Berkshire suit, Sisson was a director, an officer, and a half-owner in Berk-

shire, and owed it a fiduciary duty. Macdonald had essentially concluded negotiations on behalf of Berkshire for ninety percent of the Coastal stock when Sisson made certain representations which induced Berkshire and Macdonald to step aside and allow Sisson to purchase the Coastal shares. According to most accounts, those representations proved to be apocryphal.

ership litigation had been both pending and widely bruited about for some sixteen months. Even Macdonald does not deny that, by the time Berkshire bought Coastal, he was painfully cognizant of the plaintiffs' adverse claims.

### B. *Subsequent Administrative and Judicial Proceedings.*

The PUC exhibited understandable concern anent the fact that persons other than those originally identified as the owners of Coastal in its first application were demanding issuance of an operating certificate. The PUC had never authorized any sale or transfer of Coastal or of any beneficial interest therein, nor was it under any obligation to conform its regulations to the machinations of the current applicants. By order dated August 1, 1981, the PUC flatly refused to issue a certificate to Coastal until the ownership imbroglio was settled. It was implicit in the order that, especially in light of the two previous unauthorized transfers, Coastal would not receive permission to operate unless both the Connell group and the PUC (which had an abiding interest in local ownership) were somehow satisfied. And, the PUC geared up to solicit new applications for a Newport-area franchise. Coastal sought to enjoin these PUC proceedings, but the bankruptcy court denied the request by order of February 5, 1982. *In re Coastal Cable*, Bk.No. 81–00501, A.P. No. 81–0209 (Bankr.D.R.I. Feb. 5, 1982).[15]

Coastal then filed in the bankruptcy court a plan proposing to sell its franchise to Tele-Communications, Inc. The plaintiffs objected to this scheme. Hearings were held before the bankruptcy judge on the plaintiffs' request for a preliminary injunction against the sale of either the franchise or the shares of Coastal. Before these hearings were completed, Sisson and Berkshire gave a voluntary assurance that no such sale would occur pending determination of the issues anent ownership. Accordingly, the request for a restraining order was withdrawn.

As indicated above, the Connell group had recommenced the ownership dispute as an adversary proceeding in the bankruptcy court. They sought to resolve not only the issue of who owned the Coastal stock, but to puzzle out the related tangram as to who controlled the Newport franchise. Trial on these issues went forward in March, 1982. In mid-stream, all of the protagonists seemingly agreed to a compromise which effectively affirmed the Connell group's claim of ownership. But, the accord proved more apparent than real. When a controversy later arose concerning the timing of certain payments, Berkshire balked; and the putative settlement came to naught.

In July, 1982, over the plaintiffs' objections, the bankruptcy court approved a proposed sale of Coastal's franchise rights. After this decision was upheld by the bankruptcy appellate panel, *In re Coastal Cable T.V.*, 24 B.R. 609 (Bankr. 1st Cir.1982), the Court of Appeals for the First Circuit vacated the order, observing that:

> Unless one makes various heroic factual assumptions, it is impossible to see how the bankruptcy court could find a sale appropriate without first knowing who owns Coastal.

*Coastal I*, 709 F.2d at 764. The transfer to this court, pursuant to appellate directive, followed apace.

### II.

Given the myriad of overlapping and contradictory tales told by the parties, the task

---

**15.** Some fourteen months after the First Circuit handed down its decision in *Coastal I*, the PUC awarded a Newport-area franchise to one of the applicants in the new round of administrative proceedings. This court refused to enjoin the award. *In re Coastal Cable T.V., Inc.*, C.A. No. 83–0432–S (D.R.I. August 14, 1984) (*ore tenus* bench decision). The court has judicially noticed, Fed.R.Evid. 201, that on August 17, 1984, the PUC granted a Newport-area certificate to Bellevue Cablevision, Inc. A multitude of appeals have been taken in the state courts (including appeals by Coastal and by a Berkshire affiliate). Rhode Island does not limit the number of permits which the PUC can issue for any viewing area nor does state law in any way render cable franchises exclusive in nature.

that remains for the court is to determine which facts have been proven by the plaintiffs—and to arrange those particulars into answers to the quadrat of queries framed by the June 4 order.

### A. Was Paul Burke the owner of the Coastal stock on January 28, 1980?

The record offers three characterizations of Burke's ownership status relative to Coastal: he either (i) owned Coastal outright as its only shareholder; or (ii) held the Coastal stock as the nominee of Coastal's sole beneficial owner (Newbury); or (iii) owned no interest whatsoever in Coastal. Implicit in all three options is that the ownership situation on January 28, 1980 haled back directly to the formation of Coastal in 1972.

The first possibility (that Burke was Coastal's sole shareholder) dovetails with the now-emergent corporate papers (such as they are) and the Coastal/Sisson closing documents, but those bits of proof derive largely from Burke's self-serving actions and cannot sustain much weight. And, such a view is otherwise wholly unsupported by the record. At bottom, it is a flimsy thesis, constructed out of the sheerest of gossamer. The assertion is belied both by the credible evidence and by abecedarian common sense. The theorem deserves scant attention, and this court rejects it out of hand.

The second possibility merits closer perscrutation. Again, the corporate documentation can be read as bolstering this version. And, direct testimony from Burke, Going, and Newbury bulwarks the hypothesis that Burke held all of Coastal's stock for Newbury's benefit. But, this testimony is so honeycombed that it does not hang together, and the court is convinced that the full panoply of the facts and circumstances presented by the record shows beyond any serious question that the claim cannot be accepted. The court recognizes that this finding entails, inter alia, rejection of the sworn testimony of two prominent and well-respected members of the Rhode Island bar, and cannot be made lightly.

Yet, the thrust of the credible evidence is compelling.

Whatever his party status in this suit, see note 5 ante, Hook's testimony is crucial. It stands in stark contradiction of the Burke/Newbury tale. Hook's version of the events is, moreover, uniquely creditworthy because, unlike virtually everyone else involved in this litigation, Hook asserts a position that is not colored by the scumbled shadings of self-interest. However this dispute may eventually be resolved, the outcome does not stand either to harm or to benefit him in any material sense.

Hook maintains that Newbury approached him in 1972 and asked him to become involved in Coastal in order to protect Newbury's interest. Hook, from the start, understood this interest to be one-seventh ownership in Coastal. Newbury had his own reasons for keeping his association with the corporation in the bosom of the lodge. Hook agreed to abet this passion for secrecy and to act as Newbury's internuncio. Hook's testimony further indicates that both Burke and Going were aware of this sub rosa arrangement early on. Hook's account is solid corroboration for the plaintiffs' claim and goes far to brand the current Burke/Newbury story as a fable.

Burke's belated admission that he had merely "pencilled in" the corporate documents at a time substantially subsequent to the formation of Coastal—coming as it did so suspiciously soon after the plaintiffs' attorney made known his intention to retain a documents expert—undermined the remainder of Burke's testimony and the reliability of the documentation which he helped to generate. And, the narrative most recently trumpeted by both Burke and Newbury is a flawed garment, rent with the rips and tears of internal inconsistencies and ragged discrepancies: the ill-fitted power-of-attorney yarn and Burke's failure to notify Newbury of the Colony deal prior to signing the April option agreement exemplify this state of disrepair. Most importantly, the tale has been shredded by the plaintiffs' proof—particularly

the PUC application and the other related documents. The court cannot credit the testimony of Burke, Newbury, and/or Going when they claim to have had no idea before 1979 that the plaintiffs were asserting ownership rights. They knew not only of the contention, but of its substantial basis in fact.

Exhaustive review of the record is sufficient to persuade the court that Burke and Newbury, from day one (and Going, not too long after), were cognizant of the roles of Connell and his co-venturers; and that these roles entailed, and were only compatible with, proprietary interests on the part of the subscribers. The court is similarly persuaded that Burke held no ownership interest whatever in Coastal for himself or for Newbury, either in 1972 or on January 28, 1980, or at any time between these dates.[16] His self-contrived issuance of stock in his own name was undertaken in bad faith. He was, as he repeatedly represented himself to the PUC, the attorney for Coastal; his Paul-come-lately pretension that he was more is as insubstantial as a driftwood shanty built upon the shifting sands.

There is one further asseveration which should be dealt with under this rubric. Berkshire argued at length that the plaintiffs' proprietary claims are nullified because they failed to follow the proper formalities for subscription, share certificates, and other corporate documentation. But, this court is unaware of any authority to support the bizarre proposition that an attorney who fails to prepare and issue his clients' stock certificates thereby becomes entitled, as a consolation prize of sorts, to issue all the stock to himself and then sell it to another, for his benefit and to the detriment of those whom he was legally,

morally, and professionally bound to represent. The surrealistic nature of the contention is even more apparent when one considers the transferee's knowledge of the circumstances. Berkshire's thesis is untenable, and its argument unavailing.

B. *Was Paul Burke nevertheless in such a position that he could transfer ownership of the Coastal stock to a bona fide purchaser?*

It is unnecessary, in the court's view, to construct a full-blown analysis of the question of Burke's status as a quasi-trustee on January 28, 1980. There is, after all, a kernel of agreement at the eye of the storm: the parties all argue, in one way or another, primarily or alternatively, that the ersatz stock certificate which stood in Burke's name on that date was held for the benefit of another. The plaintiffs claim that Burke was a constructive trustee for them; defendants Sisson and Berkshire argue alternatively, acknowledging that Burke was either a trustee for Newbury or for the plaintiffs and adopting the stance that, in either event, he had power to convey. Having rejected the version which casts Newbury as the equitable owner of the Coastal stock, the court comfortably assumes arguendo that Burke—to the extent, if at all, that the stock certificate which he unilaterally caused to be issued in his own name was more than a mere piece of paper—was a constructive trustee for the plaintiffs' beneficial interests in Coastal. And, even if the court pyramids upon this assumption the further assumption that Burke thus possessed the power and ability to transfer ownership of the Coastal shares to an innocent third-party acting in good faith and buying for value,[17] the con-

---

**16.** Certainly one, some, or all of the plaintiffs (and Hook as nominee for Newbury, as well) were entitled to ownership interests in Coastal. No other plausible ownership possibilities exist. But, as framed by the parties, the questions posed do not demand answers that specifically determine, characterize or allocate the precise taxonomy of Coastal ownership. Thus, the court need not advance an opinion as to whether, and if so, what, technical questions of corporate and/or contract law are raised by the plain-

tiffs' ownership claims; or as to the exact manner in which stock should be distributed among the subscribers and their respective successors in interest.

**17.** The court does not mean to imply that there is a sound factual or legal basis for such a far-ranging assumption. It is considerably more probable that, if one views Burke as a constructive trustee for the subscribers, his power did not reach further than his role as a mere

struct avails Sisson and Berkshire not at all.

To address this point properly, the focus must shift to the status and bona fides of the purported purchasers. The critical inquiry becomes, in the Watergate phrase: what did they know and when did they know it? That query, as it pertains to Sisson, is considered in Part II(C), *post;* and, insofar as it implicates Berkshire, is treated in Part II(D), *post.*

### C. Was George Sisson a bona fide purchaser (BFP) on January 28, 1980?

The status of the parties to the stock transactions, their rights, and their respective claims of proprietary entitlement, are governed by Article 8 of the Uniform Commercial Code, R.I.Gen.Laws §§ 6A–8–101 through 8–406. The Coastal stock falls squarely within the definition of a "security" set forth in § 6A–8–102. It follows, therefore, that the question of whether Sisson was a BFP must be answered in accordance with § 6A–8–301, which provides in pertinent part:

> *Rights acquired by purchaser—"Adverse claim"—Title acquired by bona fide purchaser.—(1) Upon the delivery of a security the purchaser acquires the rights in the security which his transferor had or had actual authority to convey ....*
>
> (2) A bona fide purchaser in addition to acquiring the rights of a purchaser also acquires the security free of an adverse claim.

Thus, if Sisson was not a BFP, he could have acquired no better interest than his transferor (Burke). Conversely, only if and to the extent that Sisson was a BFP could he have taken the shares free and clear of the plaintiffs' adverse claims.

Under § 6A–8–302:

> A "bona fide purchaser" is a purchaser for value in good faith and without notice of any adverse claim who takes delivery of a security in bearer form or of one in

registered form issued to him or indorsed to him or in blank.

Good faith, as used in § 6A–8–302, is given its conventional Code meaning. *See* § 6A–1–201(19) (good faith means "honesty in fact in the conduct or transaction concerned"). The criterion is a subjective one. *E.g., Miriani v. Rodman and Renshaw, Inc.,* 358 F.Supp. 1011, 1013 (N.D.Ill.1973). *See* 1 Anderson, Uniform Commercial Code §§ 1–201:59, 60, 62 (2d ed. 1971). The pivotal element in the analysis, as it applies here, is not whether Sisson—who actually threatened litigation to compel Burke to consummate the sale—acted in good faith; that is a matter the court need not reach. *See Oscar Gruss & Son v. First State Bank of Eldorado,* 582 F.2d 424, 431 (7th Cir.1978) (per curiam) (under the UCC, *either* notice or bad faith will preclude one from achieving the safe harbor of BFP status). It suffices to say that Sisson was not "without notice of any adverse claim," as § 6A–8–302 demands.

The relevant calculus begins with § 6A–1–201(25) of the Code, which provides that:

> A person has "notice" of a fact when
> (a) he has actual knowledge of it; or
> (b) he has received a notice or notification of it; or
> (c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists.

The next integer is the definition contained in § 6A–8–301:

> "Adverse claim" includes a claim that a transfer was or would be wrongful or that a particular adverse person is the owner of or has an interest in the security.

As comment to that section states:

> An adverse claim may be either legal or equitable, e.g., that the claimant is the beneficial owner of a security, though not the legal owner of it, or that it has been or is proposed to be transferred in

repository for the shares. But, as hereinafter demonstrated, *see* text *post,* it is not necessary for purposes of this litigation, in its present

posture, precisely to define the scope of Burke's fiduciary powers and obligations.

breach of trust or a valid restriction on transfer.

Under § 6A–8–304, a buyer can be charged with notice of one or more adverse claims if he:

> has knowledge that the proceeds are being used or that the transaction is for the individual benefit of the fiduciary or otherwise in breach of duty, [then] the purchaser is charged with notice of adverse claims.

Whether Sisson acted in good faith and without notice of the claimed adverse interests of the plaintiffs is a question of fact to be determined upon consideration of all the circumstances of the transaction. *Legel Braswell Government Securities Corp. v. Irving Trust,* 695 F.2d 506, 512 (11th Cir. 1983); *Westchester County Savings and Loan v. Legel, Braswell Government Securities Corp.,* 648 F.2d 321, 327 (5th Cir. 1981); *Oscar Gruss & Son,* 582 F.2d at 430. And, "the cases are virtually unanimous in concluding that a party claiming the benefit of the status of a bona fide purchaser under Article 8 of the UCC ... bears the burden of proving that he acted without notice and in good faith." *Id.* at 433. *See also Gutekunst v. Continental Insurance Co.,* 486 F.2d 194, 195 (2d Cir. 1973); *Garner v. Pearson,* 545 F.Supp. 549, 563 (M.D.Fla.1982). *Cf. First National Bank of Philmont v. Goldman,* 46 R.I. 354, 355, 128 A. 206, 207 (1925).

Sisson admitted in his testimony (as did Berkshire in its brief) that he had actual knowledge of the plaintiffs' opposing contentions prior to the January 28, 1980 closing. Several of the documents compiled in the joint appendix indicate that Sisson knew full well that Burke was not the owner of the Coastal stock. AP&S, at Sisson's request, sent form agreements to Going to be signed by each of the Coastal shareholders. When Going failed to provide the requested stockholder information, Sisson (and Macdonald, as well) went to the PUC to procure the data directly.

To frost the cake, the Andreoni letter, authored and delivered some five days prior to the closing, afforded Sisson written notice in the plainest of terms not only of the plaintiffs' protestations of ownership but also of Burke's lack of authority to transfer the Coastal stock. The draft complaint which Sisson so righteously verified was prepared as a reflexive response to Andreoni's letter, and it set forth the plaintiffs' claims in excruciating detail. The closing documents themselves also refer to the adversative claims. No thinking person, standing in Sisson's shoes on January 28, 1980, could have doubted that the Connell group was continuing to press substantial and highly colorable claims inimical to Burke's naked representation of ownership.

In fine, the record fairly reeks with evidence of notice to, and actual knowledge by, Sisson and his lawyers anent the plaintiffs' hostile declarations and the probable merit thereof. Sisson, a commercially sophisticated buyer counselled by expensive legal talent, went forward in the face of a horde of suspicious circumstances that gave him ample reason to know that something was rotten in Newport. He chose, with his eyes open wide, to take a calculated businessman's risk. Having called the tune, he must (now that his gamble has gone sour) pay the piper. By no stretch of the most elastic imagination can Sisson be considered to have been a BFP; and the court finds that he was not one.[18]

### D. Was Berkshire a BFP from Sisson as of June 26, 1981?

In its trial brief, Berkshire conceded—as indeed it must—that it was doubly bound

---

**18.** The arguments which Berkshire advances in this regard are worse than specious. Contending that mere knowledge that shares are held by a fiduciary does not constitute notice of adverse claims, Berkshire ignores the fact that the Andreoni letter stated that Burke's actions were unauthorized and contrary to the plaintiffs' interest and intent. *See* R.I.Gen.Laws § 6A–8–304. And, Berkshire likewise overlooks the other evidentiary indicators which point in the same direction. While Berkshire may be able to bury its corporate head in the sand to this extraordinary extent, the court has no reason to adopt so struthinoid a pose. The defendants have not only failed to carry the devoir of persuasion on this issue, but the evidence is clear and convincing to the contrary.

by Sisson's and Macdonald's knowledge as of January 28, 1980; and that the events crucial to the resolution of the dispute all occurred prior to that date. Berkshire further allowed, in its reply brief, that the "[p]laintiffs' arguments as to Macdonald's and Berkshire's knowledge are unnecessary in view of [those] concessions." Thus, the court's conclusion that Sisson was not a BFP is fully dispositive of this inquiry. Berkshire, having grasped the tainted fruit from Sisson's grimy hands, and being fully cognizant (by means of the certain knowledge of its principals, Macdonald and Sisson) of the existence and origins of the taint, cannot validly claim to have sanitized the transaction by being itself a BFP. Berkshire had abundant reason to know, from January, 1980 forward, that both Burke's bona fides and the deal itself were suspect. Nothing which transpired between the date of Sisson's acquisition (January 28, 1980) and the date of the transfer to Berkshire some seventeen months later (June 16, 1981) cleansed the palate. The court therefore answers the fourth question in the negative.

### III.

It is apparent from what has gone before that the plaintiffs must prevail on the case stated before this court. The implications of this success, however, remain somewhat logografic. The court has exploded the multiple myths surrounding Burke's self-invested claims of ownership and authority. The court has also found that the putative sale of the Coastal shares to Sisson, and his subsequent transfer to Berkshire, were each riddled with duplicity. Given the sweeping knowledge of Sisson and Macdonald and the fact that the would-be transferees were unmistakably on notice, those transactions must be set aside. The plaintiffs, or some or all of them, are the authentic beneficial owners of Coastal; and Coastal retains whatever rights exist in and to the Newport-area cable television license granted by the PUC in 1974 and confirmed by the state-wide CATV settlement in 1979.

Yet, this court must proceed further, and must "determine the appropriateness of continued bankruptcy court proceedings." *Coastal I,* 709 F.2d at 765. Because Berkshire does not now and did not ever own or control Coastal, the voluntary petition signed by Macdonald and filed by Coastal on or about July 1, 1981 is likely a nullity.[19] If that was the sole hook upon which bankruptcy jurisdiction had been hung, the court would have little hesitancy in dismissing the proceedings for want of federal jurisdiction. But, the involuntary petition filed on or about June 22, 1981 by Berkshire as a creditor of Coastal, claiming an amount due and owing (as of that date) of $82,792.28, may nevertheless retain some vitality.

Counsel have indicated, *see* note 2 *ante,* that the legitimacy of the debt is "essentially a function of the stock ownership question;" and the First Circuit has been similarly sanguine. *Coastal I,* 709 F.2d at 765 ("[T]he need for a bankruptcy proceeding once the state-law ownership question is resolved seems doubtful.") Inasmuch as the indebtedness upon which the involuntary petition was purportedly bottomed was largely—if not entirely—the sum of liabilities incurred by Sisson and assumed by Coastal coincident with Berkshire's putative take-over of Coastal, *see* text *ante,* it quite probably follows from invalidation of the sequential sales that the debt is, in contemplation of law, phantasmal; or at the very least, that any enforceable portion thereof is so "comparatively tiny," *Coastal I,* 709 F.2d at 765, as not to bear the weight of a bankruptcy petition.

But, since the issue of the legitimacy of the debt vis-a-vis Coastal has not heretofore been fully litigated, it is theoretically conceivable that, notwithstanding the adverse resolution of the ownership question, counsel may be able to point to some hith-

---

**19.** Since it has been determined that the Connell group controls the shares, and since they have neither sought nor assented to bankruptcy jurisdiction, and since they have not requested—and do not now request—a sale of the license, there is no plausible legal or factual underpinning upon which Coastal's voluntary petition can comfortably repose.

erto obscure rationale which might arguably support both enforcement of the indebtedness against Coastal and the need for further proceedings in the bankruptcy court. Given the oneirataxic twists and turns which have become the call letters of the Newport cable franchise, anything is possible.

So, while the court is inclined, based on its findings of fact and conclusions of law as set forth herein, to enter a final order declaring that continued bankruptcy proceedings are inappropriate, that the bankruptcy cases should be dismissed, and that the "automatic stay" of related state court proceedings, 11 U.S.C. § 362, should be dissolved, the court will refrain for the time being from embedding such a disposition in judicial cement.

In lieu thereof, the parties shall appear before the court on Monday, November 5, 1984 at 8:30 o'clock a.m. to show cause, if any there be, (i) why the court should not enter the order described in the next preceding paragraph and/or (ii) why it is necessary or desirable that further hearings or proceedings be conducted, either in this forum or in the bankruptcy court, as to the validity of the alleged indebtedness. Any party desiring to be heard shall file with the court, no later than October 31, 1984, a written memorandum expostulating upon his or its position in regard to these issues.

*It is so ordered.*